STATE BANK OF INDIANA, Appellant, v. D. W. MENTZER.

**Stock subscriptions:** NOTES: GOOD FAITH PURCHASERS: NOTICE OF
1 FRAUD. Where the promoters of a corporation yet to be organized,
in procuring subscriptions to stock and notes in settlement therefor,
acted in pursuance of a scheme participated in by the officers of a
bank that such bank should accept the notes as security, for loans
to the corporation, the bank was charged with notice of any in-
firmities incident to the procurement of the notes, even though
its officers may not have had actual knowledge of the method
pursued. Evidence considered and held sufficient to require a sub-
mission to the jury of the issues as to the fraudulent character
of the entire enterprise, and failure of consideration for the notes.

**Bills and notes:** FRAUD: INSTRUCTIONS. In an action upon promis-
2 sory notes by one claiming to be a bona fide purchaser, where the
defense is fraud in procuring and transferring the same and the
record is complicated, an instruction which fails to call attention
to the facts claimed to constitute the fraud, is inadequate.

**Bills and notes:** DEFENSES: INSTRUCTIONS. Failure of the payee of a
3 note to keep its agreement not to transfer the same, will not con-
stitute a defense to a suit thereon by a purchaser with notice, in
the absence of proof that the maker also had a defense thereto, as
against the payee.

**Bills and notes:** FRAUD. Where the notes in suit were given in pay-
4 ment for a stock subscription, a statement that they should be paid
from profits on the stock was a representation as to a future con-
tingency, and therefore insufficient to form the basis of a charge
of fraud.

*Appeal from Linn District Court.*— HON. WM. G. THOMP-
SON, Judge.

SATURDAY, JUNE 11, 1904.

ACTION on two promissory notes. The defendant
pleaded that they were obtained by fraud, etc. Verdict for
defendant, upon which judgment was entered, and plaintiff
appeals.— *Reversed.*

*W. L. Crissman,* for appellant.

*F. L. Anderson* and *Heins & Heins,* for appellee.

LADD, J.— The Iowa Hedge & Wire Fence Company was incorporated in Indiana. It was managed by a board of seven directors. Though independent, in its origina-

1. STOCK SUB-
SCRIPTIONS:
notes; good
faith purchas-
ers; notice of
fraud.

tion, of the State Bank of Indiana, the persons in control of the bank constituted a majority of the board of directors of the hedge company. Miller was president of both corporations. Henry, cashier of the bank, and Salm and Holt, directors, were directors of the company, and at the same time, with Miller, constituted the bank's discount committee. The benevolent object of this company's existence was to render available to the people of Iowa the inestimable advantages of certain " alleged new and useful improvements," on which one Welsy Young, of Ohio, had procured patents from the general Government — one on staples, another on a machine for driving staples, two others for driving and clinching staples, two for stretching wires, another for wiring hedge fences, still another for attaching wire to hedge and other fences, three patents on hedge fences, and another on machinery for planting these — in all, eleven patents. It had acquired the rights to all of these within this State in August, 1894, and at once proceeded to dispose of them by counties. The plan adopted was to organize local companies, teach by practical demonstration how to work the farmers by inducing them to pay $1 per rod for hedge fence costing but a small fraction of that sum, and then, upon the assignment of the contracts so obtained and the patents to the local company, take the proceeds of the sale of stock therein. In pursuance of this scheme, the Cedar Valley Hedge & Wire Fence Company was organized at Cedar Rapids, to which it was proposed to transfer the patent rights for Linn, Benton, Jones, Iowa, and Johnson counties. The conditions for the sale of stock are included in the subscription paper:

The said Iowa Hedge & Wire Fence Company further proposes and agrees to secure a charter under the laws of the State of Iowa for a corporation to be known as the Cedar Valley Hedge & Wire Fence Company, having a capital stock of sixty thousand dollars ($60,000), divided into six hundred (600), shares of one hundred dollars ($100) each, free of charge and expense to said Cedar Valley Company.

And the said Iowa Company further proposes and agrees to sell within said counties above named twenty-five (25) miles of hedges and to cause the plants to be used in the construction thereof to be set, such sales and planting to be free of charge or expense to said Cedar Valley Hedge & Wire Fence Company, and to assign and turn over to said Cedar Valley Company the contracts taken for said twenty-five miles of fence, all without charge or expense to the said Cedar Valley Company, on or before the planting season of 1895.

And whenever the said Cedar Valley Company shall have been incorporated, and its stock ready for issuance, the said Iowa Company consents and agrees that two thousand dollars ($2,000), face value, in notes received by said Iowa Company from the sale of the stock of the said Cedar Valley Company or four thousand dollars ($4,000), face value, of the stock of said Cedar Valley Company shall be turned over to the treasury of the said Cedar Valley Company for its use and benefit, as said Cedar Valley Company may elect; provided, that if notes be selected, they shall be assigned without recourse.

It is further agreed by the said Iowa Hedge & Wire Fence Company, and by each of the subscribers hereto, that all notes, checks, drafts, or moneys given in settlement for the respective subscriptions hereto made, shall be turned over and held by John T. Hamilton as trustee until after the articles of incorporation of said company shall have been duly filed, its officers elected and the stock hereto subscribed for shall have been duly issued and delivered, and that thereupon all notes, checks, drafts or moneys paid to said John T. Hamilton as trustee shall be turned over to the said Iowa Hedge & Wire Fence Co. or its representatives. It is further agreed by the said Iowa Company and the subscribers hereto that the several subscriptions for stock hereto made shall not be binding until the full amount of the stock of the

Cedar Valley Company, amounting to $60,000, shall have been subscribed for at not less than fifty (50) per cent. of its face value, and the said Iowa Company hereby agrees that it, through its proper representative as trustee, will subscribe for at least one-third (1-3) of the stock of the authorized capitalization of said Cedar Valley Company.

It is further agreed that each subscriber to the instrument shall be entitled to receive two dollars ($2.00) of the stock of said Cedar Valley Company, paid up and nonassessable, for each dollar of his subscription.

It is also further agreed that as soon as all the stock of said Cedar Valley Company shall have been subscribed for as herein before stipulated, the said Iowa Company will make a deed to the said Cedar Valley Company covering all patents owned by the Iowa Company, pertaining to the planting, plashing and constructing hedge and wire fence, in, to and for the counties of Linn, Benton, Iowa, Johnson and Jones.

Think of receiving $2 in stock, subsequently changed to $3, for every dollar to be paid, and this in a company possessing contracts pledging the payment of $2,000.00 more than ten per cent. of the face value of the stock. The generosity of the proposition is apparent upon a moment's reflection. The articles of incorporation were to be procured without charge. The country about Cedar Rapids was to be beautified by the planting of honey locust hedges without expense to the new company. The contracts under which the farmers should agree to pay $1 per rod, in four equal annual installments, for these " fences that never die," were to be delivered to the new company gratuitously. Notes of the subscribers to the amount of $2,000 or $4,000 for stock in the new company were to be turned over to it as a present. As though this were not enough, the promoters of the scheme assured the subscribers that notes executed for stock would unquestionably be paid from the profits arising from the business of the new company before they matured, and that, in any event, these would not be transferred, and ample time would be given for their payment.

In addition to all this, they were escorted in a special palace car, supplied with the choicest viands, all expenses paid, to Indiana and Canada, to view the hedges growing luxuriantly in those regions. (Others were not shown.) But for the exaction of $1 per rod from the farmers for planting the hedge, thereby apparently casting the entire burden upon them, it would seem that the sole mission of the Iowa Hedge & Wire Fence Company was to go about the world doing good. About twenty-five miles of honey locust plants were set out, and, upon the report of the secretary of the Iowa Hedge & Wire Fence Company that all were doing well, a committee of the directors of the new company, without other information, acknowledged the faithful performance of the conditions precedent, and directed Hamilton to turn over the notes received for stock. Why should they inspect the plants? The stock was to cost them nothing. Their only part was to receive profits. All the plants, however, save a few rods, dried up or winter-killed. Attempts made during the next two years by the new company to replace them failed, and the entire enterprise was finally abandoned.

> " The best laid schemes o' mice an' men
>      Gang aft agley
> And lea'e us naught but grief and pain
>      For promised joy."

Contrary to expectation, the farmers made no contributions for their benefit, and therefore profits did not accrue to the subscribers. The notes remain unpaid. They were not retained by the promoting company, but transferred to the plaintiff, which, posing as an innocent purchaser, now seeks to enforce their collection. The point most strenuously urged is that the notes were taken in the ordinary course of business, without notice and for value. But we think the issue as to notice was for the determination of the jury. The claim of plaintiff is that those sued on were

transferred to it by the Iowa Hedge &˙ Wire Fence Company as collateral security of a loan made by the bank to that company. The cashier testified that the arrangement was made with R. L. Duvall, Col. Johnson, and Leon Bailey, and possibly others representing the company, and that the money was to be advanced to the parties named and others, "who went to Iowa to develop and sell hedge fence and territory, and, as fast as they realized either money or notes, these were to be turned over to the State Bank of Indiana in payment or as additional security for the money advanced. The parties representing and selling the hedge fence were to obtain this security. Q. State if you know what officers of the Iowa Hedge & Wire Fence Company obtained these advances from plaintiff's bank, and what officer of the bank gave advances for the bank? A. Well, there was an understanding between the parties who went to Iowa and Holt, Miller, Salm, and myself." Notes were executed at different times, by whom it does not appear, save that the cashier says that "Mr. Bailey made the renewals. I think he filled nearly all of them out, and would get Mr. Miller and the rest of them to sign them." In 1898 a note for a balance of $6,500 was signed, "Iowa Hedge and Wire Fence Co. H. W. Miller, Director, by order of the board of directors." The amount of these notes was credited, not to Holt, the treasurer of the company, but to Duvall, Johnson, and Bailey, and paid out on their individual checks. The notes in suit, according to the cashier's recollection, were delivered to him and Miller by Bailey, who was a member of the company. According to Miller, they were never entered on the books of the bank. He also testified that the bank was to exhaust the collaterals before collecting of the company. Another deposition of the cashier indicated that the money borrowed might have been entered to the company's credit, and later he testified that all money was loaned to the company, and checked out by Bailey as secretary. But it was for the jury to determine

in which deposition the truth was told, and the finding was open to it that the arrangement for the loan was made by the parties going to Iowa, and checked out of the bank by them.

Indeed, there is much in this record to justify the conclusion that a part of the scheme of the officers of this bank in organizing the Iowa Hedge & Wire Fence Company was to have the bank receive the notes of subscribers to the stock of local companies as an innocent purchaser. (1) Four of the bank directors, constituting its discount committee, helped organize the company, with Leon Bailey, the chief promoter, and, presumably, Duvall and Johnson, his zealous assistants, became directors of the new company; (2) the company was practically without capital, for the promoters of it began borrowing of the bank as early as in December, 1894, before the operations in Iowa had fairly begun; (3) if the cashier's first statement is to be accepted, the arrangement for the loan was made not with the board of directors, but with the three promoters, and entered to their individual credit, and paid out on their checks; (4) this was with the express understanding that the payment should be made not by the company, but by money, or secured in notes taken by the promoters in consideration of stock in local companies to be organized. Apparently, the discount committee of the bank was dealing with the promoters, rather than the new company, and the latter was but a subterfuge to be made use of only when necessary in carrying out the scheme of obtaining the money or notes of subscribers for the stock in local companies to be organized. If these promoters may be said to have been carrying out the design of this committee, representing the bank, with others, in procuring the notes, and such a finding has support in evidence, then the bank was charged with notice of any infirmities incident to their procurement, even though its officers may have been without personal knowledge of the method pursued.

Doubtless the members of the committee did not hatch

the scheme by which the notes were procured.   Its ingenuity and originality may be attributed to' one of the promoters. But the jury might have found that they participated in it, and assisted in its accomplishment.   They helped organize the Iowa Hedge & Wire Fence Company, through which the plans were to be executed.   Though not permitted to ride in the palace car which visited Indiana and Canada, they were fully advised that prospective subscribers for the stock in local companies were being entertained in this way by the promoters.   They approved of the plan of setting out honey locust plants for hedges at $1 per rod, when the cost was but a small fraction of that amount, and the assignment of contracts therefor calling for the payment of nearly a third of the cost of the stock.   Why sell the stock at thirty-three and one-third cents on the dollar, when, if the plants would grow, and similar contracts could be secured, it was worth several times that amount?  Not a rod of the incipient hedge grew.   Did they know it would not grow in Iowa? The record furnishes no definite answer.   They certainly did not know it would grow, though fully informed that the planting was to be contracted for and the stock subscriptions taken upon the representation that such a hedge was indigenous to the climate and soil of this State.   Were these representations true?  The jury might have found otherwise, and, if so, that the patents, as well as the hedge proposed, were valueless.   Without these, the stock in the local company was utterly worthless, and the notes executed therefor without consideration.   In view of the circumstances disclosed in connection with the character of the enterprise, we are inclined to say there was enough in the record to carry the case to the jury on the issues as to whether the entire scheme was fraudulent, and the notes without consideration.

II.   The defense that the notes were procured by fraud, save as to the necessity of notice thereof to plaintiff, and as to an alleged conspiracy of plaintiff, is touched in

the first instruction only, in which, after saying the burden

2. BILLS AND    of proof was upon the defendant to establish the
NOTES: fraud;
instructions.    allegations of his answer, this was added:

That is, he must satisfy you by said evidence that said note was procured by fraud and misrepresentation, with intent to cheat and defraud defendant, or that plaintiff, in concert with others, confederated together to procure said note by said means, or that the consideration for said note has failed. If defendant has satisfied you that the notes were procured by said means, or that the consideration therefor has entirely failed, then you will be warranted in finding for the defendant.

The instruction is wholly inadequate. The record is complicated, and many defenses pleaded. The jury was left to search for the particular facts claimed to constitute the fraud charged. When it is stated that the answer, with amendments, avers that the entire enterprise, from its first inception, was fraudulent; that the defendant's note was procured from the trustee upon the false representation that all the stock had been subscribed for, and that his signature to the subscription paper and notes was procured by falsely representing that one Hamilton had paid for his stock, when he had given but half price; and that this was in pursuance of a general plan to obtain subscriptions upon such misrepresentations and deceit — the force of this criticism will be appreciated. See *State Bank of Indiana v. Cook,* 125 Iowa, 111.

III. On the former trial the court gave the following instruction:

If you are satisfied from the evidence that the Iowa Hedge & Wire Fence Company represented to the defendant that, in consideration of defendant subscribing for the

3. BILLS AND    stock of the Cedar Valley Hedge & Wire Fence
NOTES:
defenses;    Company, the said Iowa Hedge & Wire Fence
instructions.    Company, would not negotiate, transfer, or assign said notes, and in payment therefor would receive the revenue or profits derived from the stock so subscribed,

and would, to the extent of two thousand dollars, place the said Cedar Valley Hedge & Wire Fence Company on a sound financial basis, and you further find that the defendant was induced thereby to execute said notes, and you also find from said evidence that such representations or agreements were not fulfilled by said Iowa Hedge & Wire Fence Company, and also that they were made for the purpose of inducing the defendant to sign the notes in suit, and you find from said evidence he was thereby induced to sign the same, this would be a good defense as to the collection of the notes by the Iowa Hedge & Wire Fence Company, but not as against the collection thereof by the plaintiff herein, unless you find from the evidence that plaintiff received the notes with a full knowledge of these alleged facts, as you are hereinafter instructed.

On appeal it was condemned. *State Bank of Indiana v. Gates,* 114 Iowa, 323, which was followed upon the reversal of a former judgment in this case. Our notion has not been altered by its repetition on the second trial. In the first place, even if the Iowa Hedge & Wire Fence Company did promise not to negotiate or transfer the note, this would not, alone, afford a defense against a purchaser with notice, unless it should also be found that the maker also had a defense to it as against the payee.

The evidence shows that the $2,000 in subscriptions was turned over to the Cedar Valley Hedge & Wire Fence Company. The representation that profits to be derived from the stock from which to satisfy the notes, 4. BILLS AND NOTES: fraud. if anything other than a mere opinion, was a representation as to a future contingency, and such as cannot form the basis of the charge of fraud. There was no evidence that an agreement was made to accept such prospective profits in full payment.

Because of the failure to fairly submit the issues raised by the pleadings, and the repetition of an error condemned on the former appeal, the judgment must be *reversed.*