[No. 9454. Department Two. July 24, 1911.]

## H. B. DAVIES, *Receiver etc., Appellant*, v. JOHN BALL *et al., Respondents.*[1]

CORPORATIONS — STOCK — BONA FIDE PURCHASER — LIABILITY FOR STOCK SUBSCRIPTIONS. The purchaser · of stock in a coal mining company at about one-half its par value, is not liable to creditors upon an unpaid stock subscription where the stock on its face was issued as fully paid and nonassessable, the purchaser had no notice that it was not fully paid, and acted in good faith, the presumption being that he was a *bona fide* purchaser.

SAME. A stockholder who advanced money for the corporation and demanded and received stock in return, issued as fully paid up stock, is not liable to creditors upon an unpaid stock subscription thereon, where he had no notice that it had been issued originally in return for property received at an overvaluation; and the fact that it was returned to the company as treasury stock does not put him on notice of such overvaluation.

SAME. The *bona fides* of a purchase of stock by one advancing money for the corporation is not affected by the fact that indebtedness was subsequently incurred upon the purchaser's representations.

SAME—INCORPORATORS—IMPLIED CONTRACT. OF SUBSCRIPTION. Incorporators of a corporation who accept stock without fully paying up for the same, are liable to creditors upon an implied subscription for the stock although no express contract was made by them.

CORPORATIONS—CAPITAL STOCK—SUBSCRIPTIONS—MINING COMPANY —STATUTES—CONSTRUCTION. Rem. & Bal. Code, § 7347, permitting mining claims to be transferred to such corporation in full payment of the capital stock without the necessity of stock subscriptions, does not apply to coal mining companies, the stockholders of which are accordingly liable to creditors upon unpaid stock subscriptions as provided by Const., art. 12, § 4, and Rem. & Bal. Code, § 3698.

[1]Reported in 116 Pac. 833.

CORPORATIONS—STOCK—SUBSCRIPTIONS—PAYMENT—PROPERTY OVER-
VALUED—INCORPORATORS.  Where incorporators accepted fully paid
up stock in a coal mining company knowing that it was issued in
exchange for property taken at an overvaluation, they are liable to
creditors upon stock subscriptions to the extent of the amount un-
paid thereon.

SAME — BONA FIDE PURCHASERS — PAYMENT IN SERVICES — GOOD
FAITH.  Persons receiving large blocks of stock in a coal mining
company for services rendered in selling a much smaller amount of
stock, are put upon inquiry as to the fact that the stock was not
fully paid up, and it is incumbent upon them to show that they
purchased for value and in good faith, in order to avoid liability
to creditors upon unpaid stock subscriptions.

CORPORATIONS — STOCK — UNPAID SUBSCRIPTIONS — ACTIONS — DE-
FENSES—NOTICE OF OVERVALUATION—ESTOPPEL.  In an action by a
receiver on behalf of creditors to recover for unpaid stock subscrip-
tions upon stock issued in return for property taken at an over-
valuation, a creditor who dealt with the corporation with knowl-
edge that the stock was issued for property of less value than the
par value of the stock, is estopped to participate in the fund or
seek enforcement of the liability.

CHADWICK, J., dissents in part.

Appeal from a judgment of the superior court for Thur-
ston county, Mitchell, J., entered November 15, 1910, upon
granting a nonsuit, dismissing an action by a receiver to
collect unpaid subscriptions to corporate stock, after a hear-
ing before the court.  Affirmed in part and reversed in part.

*E. N. Steele* and *Troy & Sturdevant,* for appellant.

*Byers & Byers,* for respondent Ball.

*Thomas M. Vance, Harry L. Parr,* and *J. W. Norvell,* for
respondents Davis *et al.*

ELLIS, J.—Action by a receiver against certain stock-
holders of a corporation, on behalf of creditors, to collect
unpaid portions of stock for which it is alleged the par value
was not paid.  From a judgment of nonsuit, this appeal was
prosecuted.

In the spring of 1909, respondent McArthur secured an
option upon certain coal lands in Thurston county, Wash-

ington. The consideration was to be $35,000, of which
$6,000 was to be paid on May 10, 1909, and the balance in
subsequent installments. About the time when he was negoti-
ating for this option, he met the respondent Kraber at Tenino,
and arrangements were entered into between them for the
organization of a company to develop these coal lands.
Kraber undertook to organize and promote the company,
and McArthur accordingly executed to him an option simi-
lar to that which he held for the lands, the principal differ-
ence being that McArthur was to receive $40,000 for the
property, and the first payment was to be $1,000 on April
1st, and the second payment $7,000 on May 10, 1909. There-
after, about April 1, 1909, Kraber organized a corporation
known as King Coal Mining Company, with a capital stock
of $500,000, consisting of 50,000 shares of a par value of
$10 each. He assigned the option which he had received
from McArthur to this corporation, taking in payment there-
for all of the stock of the corporation excepting fourteen
shares. These fourteen shares were subscribed for, two each,
by the respondents Kraber, McArthur, Newinger, Rainey,
Davis, Sornberger, and one J. R. Williams. No other stock
was ever subscribed for. The minutes of the first meeting
of stockholders held on April 3, 1909, recite that these four-
teen shares of stock were paid for in cash by the above
named subscribers. Of these Kraber, McArthur, Newinger,
Rainey, and Williams, and also the respondent Clement, were
incorporators. Kraber was elected president and manager,
Newinger, vice president, Rainey, secretary, and McArthur,
treasurer. At this meeting the corporation, by resolution,
agreed to take over the option from Kraber, and issue to
him the remaining 49,986 shares of stock in payment there-
for. The certificate for these shares was issued to him on
May 3, 1909. Of these shares Kraber, on the same day,
transferred 10,000 to himself as trustee to be used for pro-
motion purposes, and 25,000 he transferred to the company
to be held as treasury stock. From the remainder of the

stock Kraber transferred to the respondents Davis, Mc-Arthur, Rainey, Newinger, and Sornberger 100 shares each, to the respondent Clement 7,193 shares, and retained 7,193 shares.

The evidence shows that Clement was financial agent of the company, employed in selling stock, and though not clear on this point, seems to indicate that his stock was transferred to him in consideration of services to be rendered in that capacity. It appears that McArthur first aided Kraber in the management of the mine, and later paid a note of the company for $600 which has not been repaid, and he contends that this and his services paid for his stock in full. There is evidence, also, that Rainey did some type-writing and other clerical work for the company, and the claim was advanced that this was in payment for the 100 shares of stock issued to him.

In the latter part of May, 1909, Kraber visited Anacortes and employed the respondent Funk to aid him in selling stock, Funk in turn securing the aid of the respondent Mc-Callum. Through the aid of these two, Kraber sold to the respondent John Ball 2,000 shares of treasury stock for $10,000, and also transferred to Ball as a part of the same transaction 3,000 shares of the trust or promotion stock, evidently as a part of the consideration for the $10,000 which Ball then paid. This stock was all on its face "fully paid and nonassessable." Eight thousand dollars of this money was used in payment of the first and second install-ments of the purchase price of the property. Funk and McCallum each received for their services in this matter 6,250 shares of treasury stock. Ball was shortly afterward elected trustee of the corporation, but took no active part in the management of the mine until about the first of October, 1909. He advanced various sums of money to meet the payroll and pay debts of the company, and finally in September, when he had advanced about $3,000 in addition to the $10,000 paid for the stock, he demanded more stock,

and there was then issued to him 6,860 additional shares. As to the value of the property included in the option which was turned over in payment of the capital stock, the respondent Kraber testified that he took advice of a coal expert who valued it at $150,000. The receiver, Davies, who was for some time superintendent and afterwards manager of the mine, places a value at from $35,000 to $55,000 on the whole property, including equipment and timber. He states that he and Kraber estimated the coal on the land at 3,000,000 tons. Davies also testified that this coal could be sold at a profit of $1.25 per ton by the installment of proper machinery and equipment. The appellant claims that there was fraud in the inception of the corporation by reason of the overvaluation of this property, and that all of the respondents are liable to creditors for the unpaid portions of their stock.

We are of the opinion that, in any view of the case, the action was properly dismissed as to the respondent John Ball. He was not a subscriber nor an incorporator. In his first purchase of stock there can be little question that he was a *bona fide* purchaser for value. He looked over the property at the time, but it is not claimed that he had any knowledge of coal mines. There was no evidence that he was told or learned of anything which would lead him to believe that the property if properly managed was not worth the full amount for which it was capitalized. It is fairly inferable that the stock was represented to him as paid up. It was on its face "fully paid and nonassessable." He is presumed to be a *bona fide* purchaser. The correct rule in such cases is expressed in 1 Cook on Stock and Stockholders (3d ed.), § 50:

"A *bona fide* purchaser for value and without notice of stock issued by a corporation as paid up cannot be held liable on such stock in any way, either to the corporation, corporate creditors, or other persons, even though the stock was not actually paid up as represented. Such a purchaser

has a right to rely on the representations of the corporation that the stock is paid up.

"Where, however, a statement is made on the face of the certificate that it is paid-up stock, the *bona fide* purchaser of the certificate need not inquire further, but may rely on that representation, and is protected thereby against liability.

"A purchaser of stock is entitled to rely on statements in the corporate books that the stock is paid up. The law goes still further, and holds that where a person in open market, in good faith and without notice, purchases certificates, such stock is to be deemed 'paid up' in his hands, and he is protected as a *bona fide* purchaser, even though there is nothing on the face of the certificates stating that they are paid up. This can now be laid down as the established rule. It is based on sound public policy, favoring, as it does, the transfer of personal property, and the *quasi*-negotiability of stock, and discountenancing secret liens and constructive notice.

"A purchaser in open market of stock represented to be paid up, by a statement to that effect on the certificate, is presumed to be a *bona fide* purchaser. Hence there has arisen the well-established rule, both in America and England, that a *bona fide* purchaser for value, and without notice, of stock issued as paid up, is not liable for any part of the par value which may not have been paid."

See, also, *Brant v. Ehlen*, 59 Md. 1; *Troup v. Horbach*, 53 Neb. 795, 74 N. W. 326; *Young v. Erie Iron Co.*, 65 Mich. 111, 31 N. W. 814; *Steacy v. Little Rock etc. R. Co.*, Fed. Case, No. 13,329; *Foreman v. Bigelow*, 4 Cliff. (U. S.) 508.

Up to the time when he received the additional 6,860 shares, there is no evidence that he believed the property was not worth the full issue of stock. He was a trustee, but was not often at the mine nor actively connected with its management. The evidence shows that the mine had not been paying expenses, but it also shows that Davies, the present receiver, who was then superintendent of the mine, had reported at a meeting of trustees on July 6th when Ball was present that the reason for this was that more money was needed "in order to produce coal faster and with more

economy." Apparently there was no intimation at that
time that the coal was not there or that it was of inferior
·quality, as the receiver now claims. He testified that the
value of the mine or of the option was gone into at that time
"only in a general way." In fact, at that time and after-
wards, it appears that Ball was led to believe that the mine
would pay if more money was put into it, and he did advance
sums aggregating about $3,000 between then and Septem-
ber, for which, on September 28, the additional stock, which
was also on its face "fully paid and nonassessable," was
issued to him. We think that the evidence even as to this
stock fails to show that he was not a *bona fide* purchaser
for value. True, he had then access to the books of the cor-
poration and probably knew that the stock he took in pay-
ment for these advancements was treasury stock, but that
in itself does not charge him with notice that the property
was overvalued. If he examined the prior minutes and the
stock book he at most knew that the stock had been orig-
inally issued in full to Kraber, who had returned it to the
corporation to sell for working capital. This is not notice
of an overvaluation of the property.

"The fact that the person to whom the stock is issued
returns a part of it as a gift to the corporation or to
trustees for the corporation to sell the same below par and
put the proceeds in the corporate treasury for a working
capital does not necessarily prove that the property was
overvalued. The person receiving the stock may have been
willing to sacrifice a part of his stock and property in order
to make the rest more valuable." 1 Cook, Stock and Stock-
holders (3d ed.), p. 66, § 46.

It is claimed that some $2,000 of the indebtedness was
incurred upon representation made by him after this time.
That, however, would not affect his *bona fides* in purchasing
the stock. It would be immaterial in a suit by the receiver
for nonpayment of stock which he purchased in good faith
prior to such representation.

As to the other respondents, a more difficult question is

presented. The evidence shows that all save Funk and McCallum were connected with the corporation from its inception. All of the others save Davis and Sornberger were incorporators, and they are charged with knowledge that the property was not worth the full amount of the capital stock. It is not claimed that they ever actually subscribed for more than the fourteen shares shown in the subscription list. They cannot be held on an express contract of subscription. The appellant, however, contends that, under § 4, art. 12, of the state constitution, the capital stock is a trust fund for the benefit of creditors, and that the holder of stock which he takes with notice that it has not been paid in full is an implied subscriber and liable for the unpaid part of its par value. There can be no question that an actual subscription is not always necessary in order to establish a stockholder's status as that of a subscriber.

"Any agreement by which a person shows an intention to become a stockholder is sufficient to bind both him and the corporation. When one accepts or assumes the position and duties, and claims the rights and privileges and emoluments, of a stockholder, and the corporation accepts or acquiesces therein, such person is estopped to deny that he is a subscriber, even though there may have been something irregular or defective in the form or manner of his subscription, or there may have been no formal subscription at all." 1 Cook, Stock and Stockholders (3d ed.), p. 86, § 52.

See, also, 10 Cyc. 390, subd. 8.

The acceptance of stock by these incorporators, after having filed articles of incorporation declaring over their signatures that the capital stock was $500,000 and the shares of a par value of $10 each, should estop them from claiming that they did not agree to assume also the liability of subscribers for the stock. *Thompson v. Reno Sav. Bank*, 19 Nev. 103, 7 Pac. 68, 3 Am. St. 797.

While all of the stock excepting twelve shares was originally issued to Kraber, he at once, and as it appears in pursuance of the original understanding, issued stock to all

of the other respondents excepting Ball, Funk, and McCallum, who were then strangers to the transaction. We are of the opinion that the incorporators, Kraber, McArthur, Newinger, Rainey, and Clement must be held as subscribers to the extent of the stock issued to them respectively. What then is their liability? Section 4, art. 12, of the constitution, is as follows:

"Each stockholder in all incorporated companies, except corporations organized for banking or insurance purposes, shall be liable for the debts of the corporation to the amount of his unpaid stock, and no more, and one or more stockholders may be joined as parties defendant in suits to recover upon this liability."

Rem. & Bal. Code, § 3698, declares:

"Each and every stockholder shall be personally liable to the creditors of the company, to the amount of what remains unpaid upon his subscription to the capital stock, and not otherwise."

The respondents contend that this is a mining corporation within the meaning of Rem. & Bal. Code, § 7347, permitting mining claims to be transferred to such corporations in full payment of the capital stock, that therefore no subscription was necessary, and that respondents cannot be held as subscribers. We do not believe that this statute was ever intended to apply to corporations formed for the mining of coal. The words, "number of feet, shares, or interest in any claim in any mining claim in this state," seem hardly apt for describing a coal mine, but are the terms commonly used in reference to claims or locations for mining the precious metals. As stated in one of the briefs,

"It appears that the legislature, knowing that no one was able to tell what is in the ground, or the value of a mining claim, placed mining corporations on a different basis from other corporations, and the statute in question is a qualified license to gamble."

But coal mines in general do not possess the ultra speculative nature of mining claims. Ordinarily coal companies are

little more inherently speculative than corporations organized for the manufacture of lumber, or to exploit patent rights. While this statute has never been construed by this court, a doubt that it applies to coal mines is expressed in *Manhattan Trust Co. v. Seattle Coal & Iron Co.*, 19 Wash. 493, 53 Pac. 951, and now that the question is directly presented for our decision, we are constrained to hold that the doubt there expressed was well founded. It follows that the respondents Kraber, Clement, McArthur, Rainey and Newinger, who participated in the original transaction as incorporators, are liable as subscribers to the extent of their unpaid stock—that is, for the par value of the stock less the proportionate part of the actual value of the option transferred in payment, and whatever money or other consideration they may be able to show that they have paid for their stock. *Dunlap v. Rauch*, 24 Wash. 620, 64 Pac. 807; *Cox v. Dickie*, 48 Wash. 264, 93 Pac. 523; *Camden v. Stuart*, 144 U. S. 104; *Vermont Marble Co. v. Declez Granite Co.*, 135 Cal. 579, 67 Pac. 1057, 87 Am. St. 143, 56 L. R. A. 728.

The respondents Funk and McCallum occupy still another position. Unquestionably they had nothing to do with the original transaction. They received their stock for services rendered to the corporation in selling stock to Ball. They cannot be held as subscribers because they neither actually nor impliedly subscribed for any of the stock. They are not *prima facie* within the rule expressed in *Campbell v. McPhee*, 36 Wash. 593, 79 Pac. 206, because they did not buy stock upon which nothing had been paid. In that case McPhee purchased stock for cash at much below par, knowing that nothing whatever, neither money nor property, had been paid thereon. His liability was plain from the start. The defense of good faith could not be invoked. As to the two respondents here, the question is simply one of good or bad faith. The evidence before us is clearly sufficient to put these respondents to their defense. The very fact that they

received so large an amount of stock, 6,250 shares each, for effecting a sale of a much smaller amount would indicate, in the absence of proof. to the contrary, that they knew the stock was not fully paid. It seems, also, from Kraber's testimony, that these respondents were taken much more fully into his confidence than was Ball. In view of these facts, it is incumbent upon them to show that they were purchasers for value and in good faith. If they were not, the rule laid down in *Campbell v. McPhee* would manifestly apply. *Wishard v. Hansen,* 99 Iowa 307, 68 N. W. 691, 61 Am. St. 238; *Alling v. Wenzel,* 133 Ill. 264, 24 N. E. 551; *Coleman v. Howe,* 154 Ill. 458, 39 N. E. 725, 45 Am. St. 133; *Meyer v. Ruby-Trust Min. & Mill. Co.,* 192 Mo. 162, 90 S. W. 821; 1 Cook, Stock and Stockholders (3d ed.), § 49.

The respondents Davis and Sornberger were not incorporators. While they participated in the original distribution of stock, they seem to have been passive throughout the career of this corporation. If they can show that they paid anything for their stock and took it without actual knowledge that it was not fully paid up, they should be held purchasers in good faith.

There is another matter of defense which may be available to all of these respondents. They should be permitted to show, if they can, that the creditors in whose behalf this action was brought, or any of them, dealt with the corporation with knowledge of the fact that the stock was issued for property of less value than the par value of the stock. Any such creditor will be estopped to participate in the trust fund created by an enforcement of the liability of the stockholders. *Adamant Mfg. Co. v. Wallace,* 16 Wash. 614, 48 Pac. 415.

As to the value of the property, we hazard no opinion, since the evidence before us presents only one side of that question, and there must be a new trial in any event.

The judgment is affirmed as to the respondent Ball. As

to the other respondents, it is reversed and remanded for a new trial.

DUNBAR, C. J., CROW, and MORRIS, JJ., concur.

CHADWICK, J. (dissenting in part)—I concur except as to that part of the opinion holding Davis and Sornberger. As to them a *prima facie* case was not made out.