[No. 10921.   Department Two.   June 28, 1913.]

JOSEPH JOHNS, as Receiver etc., Appellant, v. WILLIAM B. COFFEE et al., Respondents.[1]

CORPORATIONS—STOCK—SUBSCRIPTIONS—FRAUD. The fact that a subscriber to capital stock gave his note and assigned stock to an existing corporation by name, does not estop him from asserting that his subscription was fraudulently induced by representations that the company was to be subsequently formed by certain persons in whom he had confidence.

APPEAL—REVIEW—FINDINGS. Findings upon directly conflicting testimony will not be disturbed on appeal where the evidence does not preponderate against them.

CORPORATIONS—STOCK—SUBSCRIPTIONS—FRAUD—LIABILITY TO CREDITORS. Where a stockholder was induced to subscribe for stock by the fraudulent representations of the corporation, and promptly rescinded, he is not liable to creditors for the balance due upon the stock, as he is himself a creditor and stands on an equal footing with other creditors.

SAME—STOCK—SUBSCRIPTIONS—FRAUD—LACHES. Where a subscriber inquired of the vice president and agent and was informed that he was subscribing to a corporation to be thereafter formed by certain men, neither the corporation nor its receiver can complain that he was guilty of laches in not ascertaining the falsity of the representations.

SAME—STOCK—SUBSCRIPTIONS—FRAUD—RESCISSION—DEFENSES. Upon the rescission of a stock subscription for fraudulently representing that the corporation was to be formed and controlled by certain men, it cannot be shown in defense that other stock of equal value was issued to the subscriber.

CORPORATIONS—INSOLVENCY—EVIDENCE. The insolvency of an insurance company is not established by the fact that it was in need

[1]Reported in 133 Pac. 4.

of ready money to meet its fire losses, and .had no way of proceeding except by calling in its stock subscriptions, upon which only one-half had been paid.

CORPORATIONS—STOCK—SUBSCRIPTIONS—FRAUD — RESCISSION—NOTICE. Where a stock subscription was induced by the fraud of the corporation, rescission may be effected by timely notice to the officers, without taking steps to withdraw from the list of stockholders, as against subsequent creditors who did not deal with the corporation on the faith of the subscription list, and had no knowledge thereof.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered October 28, 1912, upon findings in favor of the defendants, in an action on unpaid stock subscriptions.    Affirmed.

*Burkey, O'Brien & Burkey*, for appellant.

*B. S. Grosscup* and *W. C. Morrow*, for respondents.

FULLERTON, J.—In February, 1909, the Pioneer Fire Insurance Company was incorporated under the laws of the state of Washington as a domestic fire insurance company. Its articles of incorporation located its principal place of business at Seattle, Washington, and fixed the amount of its capital stock at $200,000.   On May 25, of the same year, and before it attempted to transact any insurance business, it filed supplemental articles of incorporation increasing its capital stock to $1,000,000; the stock being divided into 10,-000 shares, of the par value of $100 each.   Of these shares, the incorporators subscribed for 975, agreeing to pay therefor at the rate of $150 per share, and did pay into the treasury of the corporation, either in cash or securities taken for cash, one-half thereof, or $75 per share.   In the month of June, 1909, the company was examined by the state insurance commissioner and granted a certificate authorizing it to write fire insurance within the state of Washington from and after July 1, 1909.   In August, 1909, further supplemental articles of incorporation were filed changing the principal place of business of the corporation from Seattle, Washington, to Tacoma, Washington, and its offices were at once

moved to the Equitable building in the latter city, where they
remained until the appointment of a receiver, as hereinafter
stated.   After the removal of the corporation to Tacoma, an
effort was made to induce the citizens of that place to pur-
chase shares of stock in the corporation, and among others,
the respondent William B. Coffee was induced to subscribe
for 40 shares thereof, his contract of subscription being as
follows:

                            Pioneer Fire Insurance Company
No. 67                                   Par Value $100
                           Stock Subscription
Shares 40              .                  Subscription Price,
                                                 $150 per share
    I, the undersigned, hereby subscribe for forty shares of the
capital stock of the Pioneer Fire Insurance Company, of Tacoma,
Washington, and I promise to pay for the same at the rate of One
Hundred and Fifty Dollars ($150) per share, $100 whereof shall be
credited to capital stock and $50 to the Surplus Fund and I agree to
pay on account of this subscription the sum of Seventy-five Dollars
($75) per share, of which amount $50 per share is to be credited to
capital stock and $25 per share to surplus.                .
                            Wm. B. Coffee,
                            P. O. Address, 1012 A. St.
Dated this 2nd day of Nov., 1909. :

    In settlement of the amount immediately due, Coffee gave
his promissory note for $2,000, and agreed to assign to the
insurance company certain capital stock of the par value of
$1,000 which he held in another corporation; but which was
not at that time fully paid up; Coffee agreeing in the contract
of assignment to pay the balance due thereon as it matured,
and when fully paid to turn the stock over to the insurance
company.   The company early got into financial difficulty,
and on August 18, 1910, the board of directors passed a
resolution making a call upon all of the subscribers to the
capital stock for the balance due thereon.   The formal notice
of the call was given by the secretary on September 27, 1910.
On August 23, 1910, five days after the call was made, an in-
formal meeting of directors and stockholders of the company
was held at Tacoma, at which meeting Mr. Coffee attended.

At this meeting, the affairs of the company were fully gone over. From what he learned at this meeting, Mr. Coffee conceived that he had been deceived and fraudulently induced to make a subscription to the capital stock of the insurance company, and immediately thereafter served a notice upon the company that he rescinded and repudiated his contract of subscription and demanded the cancellation thereof and the return of the same to him, together with the sums he had paid on account of the subscription. This notification and demand was in writing, and in it the respondent demanded that the insurance company be placed immediately in the hands of a receiver and its affairs wound up without further attempt to do business or the incurrence of further indebtedness. The company, however, continued as a going concern until March, 1911, when a receiver was appointed over it at the suit of creditors. In the meantime it had greatly increased its indebtedness.

This is an action brought by the receiver to recover on the unpaid balance of the respondent's subscription. The complaint is in the usual form in such cases. The respondent answered, and among other defenses, set up that he had been induced to subscribe to the capital stock of the corporation by fraud and deceit practiced upon him by the corporation's agent and vice president. A reply was filed putting in issue this allegation of the answer, and afterwards a trial was had on the issues thus made, by the court sitting without a jury. The court determined the issues in favor of the respondent, and entered judgment in his favor. From this judgment, the receiver appeals.

The particular fraud and deceit which the court found had been perpetrated upon the respondent was that he had been induced to enter into the written contract of subscription by the false representations of the insurance company's agent to the effect that the subscription was to the capital stock of a fire insurance company thereafter to be formed by the subscribers to such capital stock, among whom were certain men

of the city of Tacoma whose names were furnished the respondent, and who the respondent well knew to be men of repute and standing in the community and of good business and financial ability, and concealed from him the fact that the corporation had then been organized and was then controlled and would thereafter continue to be controlled by men strangers to the respondent, and not by the men named to him and in whose business ability and integrity he had confidence; further finding that the respondent would not have entered into the contract of subscription had he been made aware of the true state of the matter.

The appellant assails this conclusion of the trial court on a number of grounds, the first of which is that the finding is contrary to the weight of the evidence. On this question we find the facts found by the court are testified to by the respondent and denied by the agent, with but little else in the record that seems to us to lend support to the testimony of either party, although much is pointed out in the record that it is thought to do so. It is claimed, on the part of the appellant, that a certain letter of introduction was handed the respondent by Marsh, when the respondent was first approached, which recited the fact of the insurance company's organization and incorporation, but the contention rests wholly on the evidence of Marsh, and is denied by the respondent. Again, it is said that Marsh testified that he solicited insurance from the defendant at the time he solicited his subscription to the capital stock, and that this statement is not denied by the respondent; also that Marsh testified that he showed the respondent a list of the officers and directors of the company and that his (Marsh's) name was included therein as such an officer, and that this statement is not denied by the respondent. It is probably true that the respondent did not specifically negative these statements in his testimony, but his testimony amounts to a denial of them in substance and effect. He states what did occur between Marsh and himself

at the time the subscription contract was signed, and testifies to facts which could not be true if the statements of Marsh are true. In other words, the respondent gave one version of the transaction and Marsh another and contradictory version, and a particular statement by either party cannot be taken as admitted because the other did not specifically negative it. Again, in his letter of rescission, prepared by his then counsel, the respondent makes recitals which are claimed to show that he knew at the time he made the subscription that the company was incorporated and that Marsh was an officer thereof. But we do not so read the letter. Unquestionably it shows that he knew when the letter was written that the company had been organized prior to the time he made the contract of subscription, but this was some months after that event, and after he had attended the informal meeting of stockholders where he was made acquainted with the actual facts.

Our attention is also called to the fact that the note given by the respondent in part payment for the stock was made payable to the "Pioneer Fire Insurance Company, a corporation," and the assignment of stock was made to the same company, and it is argued that this not only shows knowledge on the part of the respondent at that time of the existence of the corporation, but estops him to deny that he then knew of its corporate existence. Answering the legal question suggested, it is enough to say that the respondent does not deny the then existence of the corporation; he denies only that he knew of its existence, and the rule of law suggested does not estop him from making this denial. As to the question of fact thought to be established by these writings it must be remembered that they are no more definite in respect to the person to whom they are payable than is the subscription contract itself, and while it may be that the fact might suggest an inquiry in the mind of a more prudent person, or a person better versed in the law, than was the respondent, the failure of the respondent to observe the incongruity, does not necessarily

convict him of bearing false witness. The circumstances that are thought to support the respondent we shall not review. It is sufficient to say that, since the trial court found with the respondent, and since we are not able to find that the testimony preponderates against its conclusion, we are constrained to follow that conclusion and hold that the respondent was induced to make his subscription through the deceit and fraud of the corporation.

It is next said that the respondent could readily have obtained knowledge of the facts of which he now pleads ignorance by inquiry, and hence must be held to be guilty of laches if he failed to make such inquiry. But the respondent did inquire concerning the matters of the corporation's vice president and agent, and was told that he was subscribing to the capital stock of a corporation thereafter to be formed. This being true, it is manifest that the corporation itself cannot be heard to complain in this regard. Nor do we perceive wherein the receiver, as the representative of the creditors, has superior rights. Since the respondent was deceived by the corporation and induced by such deceit to make an investment which he otherwise would not have made, and which has proved a total loss, his equities are equal to the creditors, and he should not be made to contribute to their advancement.

Again it is said that the respondent is not injured by the fraud and deceit attributed to Marsh even though it be conceded that he was so deceived. It is somewhat difficult to follow the argument advanced to support this proposition, but it seems to be that, inasmuch as the corporation to whose stock the respondent actually subscribed was under the control of the very persons whom the respondent expected to control the corporation he anticipated would be formed, it is not to be presumed that the new corporation would have met with any better financial success than the existing one. But we cannot agree with the fact here assumed. As we read the record, the great bulk of the capital stock of the corporation was, until after the time the respondent rescinded his purchase, in

the hands of the original promoters of the scheme, and that they exercised the control and management of it until long after that time, until in fact the company became so hopelessly insolvent that nothing could be done with it except to wind up its affairs with as little loss as possible. Moreover, the argument in itself is not sound. If the respondent contracted to purchase particular stock, the contract is not fulfilled by assigning to him other stock of equal value. A vendor may sometimes be permitted to show in mitigation of damages that, in the performance of a contract to deliver a specific article, he delivered something just as good as the specific article, but he is never permitted to make such a showing as a fulfillment of the contract.

It is next contended that the attempted rescission of the contract to purchase the shares of stock was ineffectual, and the first reason suggested in its support is that the corporation was insolvent at the time. But without listing in detail its then debits and credits, we think it too much to say that it was then insolvent, if it had ever been a solvent concern. It is true the corporation was then in need of ready money to meet the accumulating fire losses, and seems to have had no means of procuring it other than by calling in the balance due upon its stock subscriptions, one-half of which only had then been paid. But this was not necessarily insolvency, and the concern still had the approval of the state insurance commissioner. At any rate, its condition financially seems to have been no worse at that time than it was when the respondent made his stock subscription.

It is further argued that the mere giving notice of rescission to the corporate officers is not in itself sufficient to accomplish a rescission, but that some action should have been taken by the respondent to have his name stricken from the stockholders' list in order to make the notice effectual. A number of English cases are cited as supporting this rule, but they seem to have been grounded upon particular provisions

of the English statutes not found in our own. The general rule, as adopted by the American cases, is thus stated by Mr. Thompson:

"Where a subscription has been procured by fraud, and the subscriber has taken timely steps, as elsewhere pointed out, to rescind the subscription, he is not then compelled to resort to equity to have the contract judicially annulled; but he can wait until the corporation brings an action to enforce the subscription, and set up the fraud as a defense." Thompson, Corporations (2d ed.), § 740.

No different rule should be applied, we think, merely because the action was delayed until after the corporation had gone into the hands of a receiver. If the respondent had a defense against a suit to recover on the unpaid balance by the corporation itself, he had a like defense against a suit by the receiver of this corporation; unless of course he has committed some affirmative act subsequent to serving his notice of rescission which would estop him from making the defense, such as inducing others to become creditors of the corporation on the faith and belief that he was a stockholder therein. No mere delay on his part will work that result. Here there is nothing to show that any of the persons the receiver represents became creditors of the corporation on the faith of the belief that the respondent was a stockholder therein. On the contrary, it is not shown that any of them ever knew he was such a stockholder until the books were searched after the corporation's insolvency.

Mr. Justice Miller in his dissenting opinion in *Upton v. Tribilcock*, 91 U. S. 45, used this language:

"I am of the opinion, that, where an agent of an existing corporation procures a subscription of additional stock in · it by fraudulent representations, the fraud can be relied on as a defense to a suit for the unpaid installments, when suit is brought by the corporation; and that if the stockholder has in reasonable time repudiated the contract, and offered to rescind before the insolvency or bankruptcy of the cor-

poration, the defense is valid against the assignee of the corporation."

So, also, the supreme court of Virginia:

"The authorities are abundant in support of the general rule that a person fraudulently induced by an agent of a corporation—and a promoter is an agent—to subscribe to its capital stock, may, at his option, repudiate the contract; and a fraud may consist as well in the suppression of what is true as in the representation of what is false. Indeed, the law is that where the person solicited to subscribe has no other information on the subject than that which the agent chooses to convey, the statements of the agent ought to be characterized by the utmost candor and honesty. 1 Cook, Stock, Stockh. and Corp. Law (3d ed.), sec. 147; *Crump v. U. S. Mining Co.*, 7 Gratt. 352; *Bosher v. R. & H. Land Co.*, 89 Va. 455; *Directors etc. v. Kisch*, L. R. 2 H. L. App. Cas. 99." *Virginia Land Co. v. Haupt*, 90 Va. 533, 19 S. E. 168.

In the foregoing discussion, we have noticed only what seems to us to be the principal reasons advanced by the appellant in support of his contentions, as to follow the argument, seriatim, would extend this opinion to an undue length. It is enough to say, therefore, that we have examined the arguments of the receiver with care, and find nothing that in our judgment warrants a reversal of the judgment entered by the trial court.

The judgment is affirmed.

MORRIS, ELLIS, and MAIN, JJ., concur.