[No. 11443.  Department One.  March 25, 1914.]

JOSEPH JOHNS, *as Receiver etc., Respondent,* v.
E. J. CLOTHER *et al., Appellants.*[1]

CORPORATIONS—STOCK—SUBSCRIPTIONS—PAYMENT—TRUST FUND—
RIGHTS OF CREDITORS.  The stock of a corporation being a trust fund
for the benefit of creditors, it is no defense to a receiver's action on
a stock subscription that the stock was subscribed under an agree-
ment to pay less than par for stock issued as fully paid up, and' that
unpaid balances would not be called for.

SAME—ACTION ON SUBSCRIPTION—DEFENSES.  That a stock sub-
scription was induced by representations that the stock had been
wholly subscribed by responsible people, is immaterial, where it was
not claimed that the subscription was void *in toto*, and the only issue
was as to the agreed price.

SAME—LIABILITY OF STOCKHOLDERS — EXTENT OF LIABILITY — SUB-
SCRIPTION TO SURPLUS FUND.  A stock subscription whereby the sub-
scriber agreed to pay $50 per share over and' above the par value,
to be credited to a surplus fund, is legal and binding, both as to
the corporation and creditors, where the surplus fund was intended
as an additional asset upon which creditors could rely, and where
all the stockholders subscribed proportionately to the fund; and
Const., art. 12, § 4, and Rem. & Bal. Code, § 3698, limiting the lia-
bility of stockholders for the debts of the corporation to the unpaid
balance due on the capital stock is not a limitation upon the power
of the stockholder to contract with the corporation in reference to
a surplus fund.

SAME—LIABILITY OF STOCKHOLDERS—ACTIONS—DEFENSES—BURDEN
OF PROOF.  The burden of establishing that creditors did not rely
upon a surplus fund provided by the corporation as an additional
asset, or that they were estopped to take advantage of it, is upon
the stockholders who had bound themselves to provide the fund.

SAME—STOCKHOLDERS—SUBSCRIPTIONS — LIABILITY TO CREDITORS—
ESTOPPEL.  One who allowed a corporation to hold him out as a
stockholder (under a tentative subscription or option to take stock)
in order to influence others to take stock or insurance in the com-
pany, is estopped' from asserting, as against creditors, that his stock
subscription or agreement was induced by fraudulent representations
of the corporation, and that he was not in fact a subscriber.

HUSBAND AND WIFE—COMMUNITY DEBTS—PRESUMPTION.  The pre-
sumption is that a stock subscription by a married man was for the
benefit of the community and created a community debt.

[1] Reported in 139 Pac. 755.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered February 17, 1913, upon findings in favor of the plaintiff, in an action to recover unpaid stock subscriptions, tried to the court. Affirmed.

*Leo & Flaskett*, for appellants Clother.

*McCafferty, Robinson & Godfrey*, for appellants Mentzer.

*Burkey, O'Brien & Burkey*, for respondent.

ELLIS, J.—This action was originally commenced by J. H. Bridgeford, as receiver of the Pioneer Fire Insurance Company, hereinafter designated as the insurance company, against the defendants Clother and wife and Mentzer and wife and certain others, to recover the amount of unpaid subscriptions to the capital stock and surplus fund of the company. The action was discontinued as to the other defendants. The defendants Clother and wife and Mentzer and wife interposed separate defenses, and the issues as to both were tried below at the same time. The two sets of defendants appealed separately, but the appeals were heard at the same time in this court. The present plaintiff is the successor to the original plaintiff as receiver of the insurance company.

In February, 1909, the insurance company was incorporated under the laws of this state, with its home office at Seattle, and a capital stock of $200,000. On May 25, 1909, by supplemental articles, it increased its capital stock to $1,000,000, divided into shares of $100 each. The incorporators subscribed for the full amount, but, before doing any business, and with the consent of all then concerned, this subscription, save as to 973 shares, was cancelled and for those shares the incorporators agreed to pay $150 a share, $100 on each share to go into capital and $50 into a surplus fund. We held these cancellations valid in *National Realty Co. v. Neilson*, 73 Wash. 89, 131 Pac. 446, and *Johns v. Coffee*, 74 Wash. 189, 133 Pac. 4, to which reference is made for a more complete statement.

JOHNS v. CLOTHER.

About July 1, 1909, the Securities Corporation of Tacoma, a corporation composed of certain prominent business men of Tacoma, proposed to the insurance company that, if it would move its home office to Tacoma, the Securities Corporation would place two hundred shares of stock of the insurance company at $75 a share. The insurance company passed a resolution accepting this offer and, in August, 1909, further supplemental articles were filed, changing the place of business of the corporation from Seattle to Tacoma.

The complaint was in the usual form in such cases, and set out Clother's contract of subscription as follows:

PIONEER FIRE INSURANCE COMPANY.

No. 65                         Par value $100

Shares 20                     Subscription

Price $150 a share.

Stock Subscription.

I, the undersigned, hereby subscribe for twenty shares of the capital stock of the Pioneer Fire Insurance Company of Tacoma, Washington, and I promise to pay for the same at the rate of one hundred and fifty dollars ($150) per share, $100 whereof shall be credited to capital stock and $50 to the surplus fund and I agree on account of this subscription to pay the sum of seventy-five dollars ($75) per share of which amount $50 per share is to be credited to capital stock and $25 per share to surplus.

Dated this 22d day of October, 1909.     (Signed) E. J. Clother,

P. O. Address, 768 So. E. St. Tacoma.

The complaint alleged that the Clother subscription was made by the defendant E. J. Clother for himself and the community composed of himself and wife; that, upon the subscription, $1,500 had been paid, leaving a balance unpaid of $1,500. Since different issues are presented by the separate answers, we shall separately discuss the two appeals.

The amended answer of the defendants Clother admits the signing of the subscription contract, but alleges that it was procured by false and fraudulent statements made by the agent of the company, to the effect that the subscription price should be only $75 a share; that the insurance company was solvent; that its capital stock had been wholly subscribed by responsible persons and that it then had sufficient surplus to

take care of all insurance risks then outstanding. It is alleged that these representations were false; that the creditors of the company had no knowledge that the stock had been subscribed for at more than $100 a share, but relied wholly on the value of the capital stock at that amount a share; that no trust was therefore imposed upon the additional subscription price of $50 a share in favor of the creditors. The answer further alleges the issuance of a stock certificate to Clother, certifying that he is the owner of twenty shares of a par value of $100 each, acknowledging payment of $75 per share, $50 of which is applied on capital and $25 on surplus. The answer concludes with a prayer that the entire payments be credited to the capital stock, and that the liability of the defendants Clother be limited to $500, the amount due on the stock at a par value of $100 per share.

At the trial, a supplemental answer was filed, alleging that the defendants Clother paid for their stock $250 cash and $1,250 in notes, which are still retained by the corporation and were accepted in full payment for the twenty shares of stock. The reply to the amended answer admits the issuance of the certificate, and alleges that each subscriber agreed to pay $50 a share to the surplus fund, in addition to the par value of the stock, which fact was made generally known to the public and all persons dealing with the company, as an inducement leading persons to insure in the company and extend to it credit. The reply to the supplemental answer admits the payment of $250 and the giving of notes for $1,-250.

The cause was tried to the court without a jury, and the court made findings, in substance, in accordance with the allegations of the complaint, concluding, as a matter of law, that the plaintiff was entitled to judgment against E. J. Clother and the community composed of E. J. Clother and wife in the sum of $1,500, with interest at the rate of six per cent per annum from September 27, 1910, the date of the call made by the trustees of the corporation for the unpaid

balance of the stock subscription, and for costs. Judgment went accordingly.

There are certain references in the respondent's brief to a second amended answer asking a reformation of the written contract of subscription, on the ground of mutual mistake, but no such pleading appears in the transcript. For this reason, we could not consider oral testimony tending to contradict the written instrument but for the fact that the issue of fraud was raised in the amended answer found in the transcript as certified by the clerk, and upon which, as shown by its findings, the trial court seems to have proceeded, and upon which the appellants present their appeal. In any event, there was no evidence sufficient to establish such a mutual mistake as to warrant reformation, whatever Clother himself may have understood.

The appellants Clother present two grounds which they claim warrant a reversal: (1) that the insurance company, being at the time solvent, had the legal right to dispose of its stock at less than par; that its agent represented to Clother that all he would have to pay on the subscription, regardless of its terms, was $75 a share and that the subscription was induced by that representation which, accordingly, constituted the only valid contract; (2) that in no event can the appellants Clother be held liable for more than the difference between $75 a share paid for the stock and its par value of $100 a share.

The first claim presents a mixture of law and fact. It is obvious that, if the legal premise be unsound as applied to a suit on behalf of creditors, then, even conceding the assumed fact that the agreement was to pay only $75 a share, it would constitute no defense to such a suit. No fraud going to the very basis of the contract of subscription was either pleaded or proved. It is not claimed, as it was in the *Coffee* case, that there was any misrepresentation as to the identity of the corporation. That Clother did subscribe, and intended to subscribe for twenty shares of stock of the identical cor-

poration represented, cannot be questioned, either under the pleadings or the evidence. His whole claim of fraud, as set out in his pleadings and as shown by his testimony, was that the agent represented that he would never have to pay more than $75 a share; that the company then had sufficient surplus to meet outstanding risks; that the stock was worth $150 a share, and that the company was then solvent. The last representation, it is now admitted, was true. This admission of solvency would seem to carry with it a concession that the surplus was then sufficient. Moreover, the only direct evidence on the subject was that sufficient had then been subscribed to the surplus fund to take care of then outstanding risks. The agent expressly denied that he ever represented the stock as worth $150 a share. At any rate, such a statement could only have been a mere expression of opinion and must have been so understood, since Clother knew that the corporation had just been organized and that the value of its stock was hence necessarily speculative. The finally contested issue of fact is thus reduced to the sole question as to what was the actual agreed price, as between the corporation and the appellants Clother. As a matter of law, what that agreement was is immaterial, so far as the rights of creditors are concerned. In the absence of affirmative proof of estoppel as against the creditors to deny that it was less, or of affirmative proof of estoppel as against the subscriber to deny that it was more, the liability of the subscriber to the creditors is determined by the par value of the stock, regardless of what he paid or agreed to pay for it. That the capital stock is a trust fund for the benefit of creditors which may not be impaired by any agreement between the corporation and the subscriber is now the settled law of this state. *Adamant Mfg. Co. v. Wallace,* 16 Wash. 614, 48 Pac. 415; *Dunlap v. Rauch,* 24 Wash. 620, 64 Pac. 807; *Cox v. Dickie,* 48 Wash. 264, 93 Pac. 523; *Davies v. Ball,* 64 Wash. 292, 116 Pac. 833;

*Lantz v. Moeller,* 76 Wash. 429, 136 Pac. 687; *Gordon v. Cummings, ante* p. 515, 139 Pac. 489.

The appellants rely upon the decisions in *Turner v. Bailey,* 12 Wash. 634, 42 Pac. 115, and *Kroenert v. Johnston,* 19 Wash. 96, 52 Pac. 605. But those decisions, so far as they announced a doctrine contrary to the trust fund theory, are expressly overruled in *Lantz v. Moeller, supra,* by the entire court sitting *En Banc.* Even assuming that Marsh unqualifiedly represented that the company would be so prosperous that unpaid balances would never be called, which is all that the evidence shows, that would be no defense when the demands of creditors necessitate its payment. Such a representation touching a future contingency is insufficient to form the basis for a charge of fraud. *State Bank of Indiana v. Mentzer,* 125 Iowa 101, 100 N. W. 69.

The decision in *Johns v. Coffee, supra,* is not contrary to the views here expressed. In that case, the trial court found, upon what we could not say was insufficient evidence, that Coffee was induced to subscribe through false and fraudulent representations that the insurance company was thereafter to be formed; that, having agreed to take stock only in a corporation so represented to be thereafter organized, the contract was not fulfilled by assigning to him stock in a different corporation which had already been organized and was then in operation; that he was therefore entitled to rescind the contract of subscription by giving notice of rescission as soon as he discovered the true facts and before the corporation was known to be insolvent. The appellants here neither pleaded nor sought to prove any such ground of fraud as that established in the *Coffee* case. Coffee's defense established the invalidity of his subscription *in toto.* The defense here admits the validity of the subscription at some price, the only real issue being as to what that price should be. The considerations clearly distinguish the *Coffee* case from that of the appellants here.

What we have said disposes of the charge that the agent

falsely represented that the stock had been wholly subscribed by responsible persons. This could only be material if the appellant were now claiming that his subscription was void *in toto*. Admitting, as he does, that the corporation was, in fact, solvent and, in effect, that his subscription was a valid subscription, the only contention being as to price, a representation as to other subscribers becomes immaterial. Moreover, the evidence does not fairly sustain the charge of fraud mentioned. While the agent, according to the appellant's testimony, did represent that certain responsible persons in Tacoma were interested in the corporation, the evidence also shows that, as a matter of fact, all of the persons so mentioned, save two or three, were interested.

The second contention presents a more difficult question. The appellants rely upon § 4, article 12, of the state constitution, and the statute, Rem. & Bal. Code, § 3698 (P. C. 405 § 43), each declaring, in effect, that the stockholder shall be liable for the debts of the corporation to the amount of his unpaid capital stock and no more. It is argued that "the law nowhere provides that a stockholder shall be liable to the creditors of the company for what may remain unpaid upon a contract he signs to aid the company in creating a surplus fund," and that "this is especially true where, as in the case at bar, the contract itself clearly distinguishes between the capital stock and the surplus fund."

This argument is plausible but specious. The constitution and the statute create a liability as a matter of law to the extent of the par value of the stock and no more, from the very fact of subscription, regardless of any attempted limitations in the contract of subscription. This liability may arise as an implication of law even where there was no formal subscription. *Davies v. Ball, supra.* But the limitation of liability of the stockholder to no more than the unpaid part of the par value of the stock is a limitation on the implied legal undertaking to pay for the capital stock at par re-

gardless of the contract, not a limitation upon the power of the stockholder to contract with the corporation in reference to a surplus fund, or any other matter. The provisions of the constitution and statute were intended to preserve, not to impair, the assets of the corporation. Neither was ever intended to invalidate or prohibit any contracts between the corporation and its stockholders other than those tending to impair the capital stock. So far as we are advised, neither this court nor any other court has ever held with appellants' contention. On the other hand, we have held that such a contract is valid and binding as in favor of creditors of the corporation. In *National Realty Co. v. Neilson*, 73 Wash. 89, 131 Pac. 446, the written contract of subscription was identical with that here involved. By it, $100 a share was to be paid to capital stock and $50 per share to surplus fund. The representations upon which it was made were also substantially the same as claimed here. Judgment was rendered in favor of the assignee on a note given in payment of the contract. The proceeds of the note in the form of bonds taken by the insurance company from the assignee were held valid assets of the insurance company. Neilson sought judgment over against the insurance company for all he was compelled to pay above the par value of the stock. We said:

"These bonds then became a part of the assets of the Pioneer Fire Insurance Company. To give Neilson a judgment for the difference between the par value of the stock and the subscription price would be to permit a stockholder as such to share equally with the creditors in the application of the assets. There can be no question but that the rights of the creditors in the assets of an insolvent corporation are superior to those of the stockholders."

Here again there is a marked distinction between the *Neilson* case and the *Coffee* case. Through the character of the fraud found by the trial court to have been practiced on Coffee, he never, in reality, became a stockholder. He re-

scinded as soon as he knew that he had subscribed to an existing, rather than a future corporation. On these facts, wholly different from those in the *Neilson* case, and from those found by the trial court here, we held that his equities were equal to those of the creditors. Here an actual binding subscription at some price was admitted. The distinction is plain.

The contract to pay $50 a share over and above the par value into the surplus fund was not different in purpose or principle from the subscriptions to the guaranty fund which we held valid and binding as in favor of creditors in *McConaughy v. Juvenal*, 73 Wash. 166, 131 Pac. 851. In both cases, the purpose was to aid the credit of the company. In the absence of clear evidence to the contrary, we must assume that it had the intended effect. The contract of subscription to the surplus fund was intended, on its face, to create an additional asset upon which creditors might rely, and to which they might resort. Such being the only possible purpose of the surplus fund, the subscribers thereto should be held estopped to set up, as against creditors and insurers, a secret agreement that the amount subscribed should never be paid. On the other hand, the creditors could only be estopped to insist upon payment in full by clear proof that they had knowledge of the agreement that it should not be paid. Our decisions in *Adamant Mfg. Co. v. Wallace, supra*, and *Davies v. Ball, supra*, go no further than to uphold estoppels based upon actual knowledge. Estoppel is an affirmative defense and, to be available, must be pleaded and proved. The appellants contend that there was no evidence that the creditors knew of, or acted upon the good faith of the surplus fund; but, what is more to the point, there was certainly no evidence that they did not so act. The burden of proving that the creditors extended credit or took insurance, knowing that the surplus fund was, as it is now claimed, intended to be a farce, if that could be held a defense at all, was upon the subscribers.

Nor was the agreement of subscription to the surplus fund without consideration. Every stockholder was interested in the success of the corporation, and the evidence clearly shows that each was required to and did subscribe in the same proportion to this fund. This was sufficient to operate as a binding consideration as between the different subscribers and, hence, as in favor of the corporation itself. The contract thus became a valid asset in the hands of the corporation and the right to enforce it passed with the other assets to the receiver. When the appellant signed the contract, he knew that, on its face, it bound him to pay into the surplus fund $50 for each share of his stock. The representation of the agent that no more than $75 a share would ever be called for on both capital stock and surplus fund, in the face of the appellant's confessed knowledge of the contents of his contract, must be held no more than an expression of an opinion, upon which he had no right to rely. The agent's statement that the appellant "settled" for "$75 a share" cannot be permitted to override the plain terms of the written contract. The evidence, as it seems to us, wholly failed to overcome the presumption that the appellant knew that he was making a speculative contract and that the extent, either of profits or losses, thereon would depend upon the success or failure of the corporation.

Addressing ourselves to the case of the defendants Mentzer, we find that the complaint, so far as peculiar to them, sets out the contract of subscription as follows:

CAPITAL STOCK $1,000,000.
Shares $100 each.

I, the undersigned, hereby subscribe for 10 shares of the capital stock of the Pioneer Fire Insurance Company, of Seattle, Washington; and it is agreed that said stock is subscribed on the basis of one hundred and fifty dollars ($150) per share, on which I agree to pay the sum of seventy-five dollars ($75) per share; of which amount $50 per share is to be credited on the stock and $25 per share for the surplus fund.          T. F. Mentzer, Subscriber.

and alleges that no payment has been made thereon. The other allegations are the same as to all parties. The answer

admitted the signing of the contract, but denied that Mentzer subscribed for the stock except conditionally.

As an affirmative defense, Mentzer alleged that he signed the contract upon the false and fraudulent representation that the capital stock had been wholly subscribed by citizens of Washington, financially responsible, and paid in money or its equivalent; that the corporation was solvent; that it had sufficient surplus in its treasury to take care of outstanding risks; and that the stock was worth $150 a share. He further alleged that the corporation applied to him to permit his name to be used as a friend of the corporation as a tentative stockholder in the vicinity of Tenino, where he resided and was well and favorably known; that it was understood that his subscription was a mere option which might be exercised at any time, but that no time limit was fixed; that there was to be no liability unless he concluded to take the stock; that he never exercised the option, and was never notified to do so. As in the other case, the court found substantially with the allegations of the complaint, and entered judgment against the defendant Mentzer and the community composed of himself and wife for $1,500, with interest at six per cent per annum from September 27, 1910, the date of call for payment.

The claims of the appellants Mentzer, so far as separable, may be stated as follows: (1) that the contract of subscription should be held void because induced by fraudulent representations; (2) that, as a matter of fact, there was no subscription, but only a tentative subscription to be used by the company in aid of its business, only an option which was never exercised; (3) that, in any event, the judgment is erroneous as against the community.

In the light of the pleadings and the evidence, the first two contentions constitute no defense. The one necessarily defeats the other. Mentzer's version of the contract would permit the company to hold him out as a *bona fide* subscriber

when in fact he was not. This would be a fraud on its face. Let us concede every misrepresentation claimed. Let us concede, also, that the subscription was merely tentative and not actual. It was obviously taken to enable the company, by holding Mentzer out to the public as a stockholder, to secure other subscribers, or to procure business and advance its credit. Mentzer would then be in the anomalous attitude of seeking to excuse his own conscious participation in what would be, on its face, a fraud on other stockholders and on creditors and insurers, by pleading as an excuse for his own participation, an independent fraud of the company in misrepresenting other facts to him. The fraudulent feature of his own contract, and in which he knowingly participated, would exist independently of the fraudulent representations claimed to have been made 'by the agent to him. To permit such a defense, as against the suit of the receiver representing the creditors, would be to permit Mentzer to take advantage of his own fraud on the ground that the company, not the creditors, had attempted to defraud him. His own version of the contract was substantially that it was to be used where he was well and favorably known, to influence others to take stock or insurance in the company. Neither his answer nor his testimony is capable of any other meaning. The evidence shows, beyond question, that the company did hold him out as one of its principal stockholders, in its literature, which was widely circulated, and that he was advised of that fact by a letter from Marsh in September, 1909, enclosing and calling particular attention to a leaflet designating Mentzer as a stockholder. Knowing the nature of his contract, knowing the use which was being made of it, he made no objection to that use, made no claim that he was not a stockholder, or that his subscription was merely an option until October, 1910, and after the call of the directors for payment of his unpaid subscription. Whatever his intentions, the facts

estop him to claim as against the creditors that he was not a subscriber.

"But this is upon the ground that by allowing his name to appear upon the stock list as owner he represents that he is such owner; and he will not be permitted, after the bank fails and when an assessment is made, to assume any other position as against creditors. If, as between creditors and the person assessed, the latter is not held bound by that representation, the list of shareholders required to be kept for the inspection of creditors and others would lose most of its value." *Pauly v. State Loan & Trust Co.*, 165 U. S. 606, 622.

Appellants claim that our decision in *Johns v. Coffee, supra*, is decisive of this case. There are, however, two clear grounds of distinction. In the first place, the trial court, in the *Coffee* case, found in Coffee's favor upon conflicting evidence. We were unable to say that the court found contrary to the weight of the evidence. In the present case, the court found in the receiver's favor upon conflicting evidence. We have examined this evidence with care, and we cannot say that the finding is contrary to its weight. In the second place, Coffee's case was not complicated as that of the appellants here by the claim that his subscription was, in any event, a mere lending of his name to be used as that of a subscriber when in fact he was only to be such at his own option.

We find no merit in the claim that the Mentzer judgment is erroneous in that it subjects both the separate property of Mentzer and the community property of Mentzer and wife to its payment. There is no claim that he was not married when he signed the contract. The unrebutted presumption is that the contract was made for the benefit of the community. *Oregon Improvement Co. v. Sagmeister*, 4 Wash. 710, 30 Pac. 1058, 19 L. R. A. 233; *Calhoun v. Leary*, 6 Wash. 17, 32 Pac. 1070; *La Selle v. Woolery*, 11 Wash. 337, 39 Pac. 663, 53 Am. St. 855, 32 L. R. A. 73;

*Bryant v. Stetson & Post Mill Co.*, 13 Wash. 692, 43 Pac. 931; *Shuey v. Adair*, 24 Wash. 378, 64 Pac. 536; *Clark v. Eltinge*, 29 Wash. 215, 69 Pac. 736.

The judgments in both cases are affirmed.

CROW, C. J., CHADWICK, MAIN, and GOSE, JJ., concur.