**HARN, Receiver, v. SMITH et al.**

No. 9931—Opinion Filed Sept. 13, 1921.

Rehearing Denied Feb. 28, 1922.

(Syllabus.)

1. **Jury—Right to Jury Trial—Mortgage Foreclosure—Issue as to Amount Due.**

In an action for the recovery of money due on a promissory note executed by the defendants, and for the foreclosure of a mortgage given to secure the payment of said note, where issue is joined as to the indebtedness due, either party is entitled to a trial by jury as a matter of right.

2. **Corporations—Subscriptions to Stock—Mortgage Note for Insurance Company Stock—Effect.**

A note of a subscriber to the corporate stock of an insurance company, secured by a first mortgage on real estate, accepted by the corporation in payment for stock is "property actually received" within the meaning of section 39, art. 9, of the Constitution, inasmuch as insurance companies are authorized by section 3444, Revised Laws of 1910, to invest their assets in loans upon improved and unincumbered real property.

3. **Receivers—Title or Right Acquired by—Defenses to Suits by.**

The receiver of an insolvent, nongoing corporation takes the property of the company for the creditors, subject to such equities liens, or incumbrances, whether created by operation of law or by act of the corporation, as existed against the property at the time of his appointment, and where a defrauded stockholder is sued by a receiver upon his stock subscription contracts procured by the fraudulent acts of the officers and agents of the corporation, such stockholder may plead such fraud as a defense, the same and with like effect as though the suit were by the corporation.

4. **Contracts—Fraud—Rescission—Laches.**

Where a contract is procured under such circumstances as to render it voidable for fraud, neither laches nor acquiescence can be based upon a failure of the injured party to move for its cancellation while the same conditions which caused its execution continue. To prevent one from rescinding a contract of purchase by which he has been defrauded upon the ground that he has acquiesced therein, the alleged act of acquiescence must be unequivocal and must show an election to retain the property after discovering the deceit. Plea of laches predicated merely upon delay, is not sufficient. It must be shown, in addition to delay, that injury has resulted from the delay.

5. **Same—Ratification or Waiver of Fraud —Intent—Question for Jury.**

Where there is evidence tending to show that the defrauded party by his conduct has ratified a fraudulent contract or waived the fraud, the question of whether he intended such ratification and waiver is a necessary ingredient to constitute a ratification and waiver, and such intent is a question of fact for the jury.

6. **Sales—Rescission for Fraud—Tender.**

No technical tender of property which a vendee was defrauded into buying, need be made to the fraudulent vendor before the commencement of an equity suit to compel a rescission on the grounds of fraud. It is sufficient if the vendee can show that he has preserved the property substantially in the condition in which he received it, without intentional or unnecessary change.

7. **Appeal and Error—Questions of Fact— Review of Verdict.**

In a civil action, triable to the jury, where there is competent evidence reasonably tending to support the verdict of the jury, and no prejudicial errors of law are shown in the instructions of the court, or its ruling on the questions presented during the trial, the verdict of the jury will not be disturbed on appeal.

McNeill and Nicholson, JJ., dissenting

Error from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

Action by A. B. Harn, as receiver of the Merchants & Planters Insurance Company, a corporation, against Simon Smith and others, for judgment on a promissory note and foreclosure of a mortgage given to secure the same. Judgment for defendants, and plaintiff brings error. Affirmed.

Davidson & Williams, for plaintiff in error.

J. T. Dickerson, Paul Pinkerton, W. L. Spitler, Harris & Young, and Linn & Riddle, for defendants in error.

JOHNSON, J. This action was instituted in the district court of Oklahoma county by A. B. Harn, as receiver of the Merchants & Planters Insurance Company, a corporation, against Simon Smith. Mary F. Smith, Salome Kate Mercer, O. E. Hayes, Mary G. Hayes, and Henry H. Englebright, to recover of the defendants Simon Smith and Mary F. Smith the sum of $10,000, alleged to be due upon a promissory note, and for foreclosure of a mortgage covering certain real

estate in Oklahoma and Canadian counties, given to secure the payment of said note.

After the appeal was lodged in this court the defendant Simon Smith died, and this case has been revived against Salome Kate Mercer and Mary G. Hayes as heirs at law of Simon Smith, and against all other defendants.

The petition, after alleging the authority of the plaintiff in error, is in the usual form in foreclosure actions, prays judgment on the note for the sum of $10,000 against the defendants Simon Smith and Mary F. Smith, and for foreclosure of the mortgage against all the defendants. The amended answer, after denying the corporate existence of the Merchants & Planters Insurance Company, admits the execution of the note and mortgage sued on, and as an affirmative defense avers that Simon Smith and Mary F. Smith were induced to execute said note and mortgage by false and fraudulent representations of the officers and agents of the Merchants & Planters Insurance Company, and that said note was executed without consideration.

It appears from the record that John A. Oliphant had been the attorney, and was at the time of this transaction agent for the sale of stock for the insurance company; that he talked with the defendants Simon Smith and Mary F. Smith on two or three occasions in regard to the sale of stock in the insurance company; that he stated to the Smiths that the company was in first-class financial condition in every particular, and had plenty of assets to do business; that John O. Mitchell, the vice president, was one of the wealthy men of Tulsa, and a very strong business man and capable of transacting and doing the business of the company successfully, and that he (Oliphant) was sure that Mitchell would manage correctly the business of the insurance company. He further stated that George T. Williamson was a banker, was a man of large means and good business capacity; that he was treasurer of the company and a member of the board of directors, and that Mitchell and Williamson owned $78,000 of the stock of the company, fully paid. He further stated that the year previous to the time of the transaction with Smith (which was in 1909) the company had paid a dividend of 100 per cent., and that the year previous to that it had declared a dividend of 75 per cent. Oliphant testified that the representations so made by him were based upon information furnished him by the officers of the company. It further appears from the record that, relying upon the representations made, the defendants Simon Smith

and Mary F. Smith executed the note sued on herein for the sum of $10,000, and also executed their mortgage securing the same, and that the Merchants & Planters Insurance Company issued and delivered to the defendant Simon Smith 266⅔ shares of the stock of said company at the price of $37.50 per share, the par value of the stock being $25 per share. It is further disclosed by the record that the statements and representations so made and so relied upon by the Smiths were false in practically every particular; that the insurance company was in fact insolvent at the time of the execution of the note and mortgage by Smith and the delivery of the stock certificates by the company, and that Smith discovered this fact and learned of said false and fraudulent representations a short time after the receiver had been appointed, and when the receiver gave him notice to pay the interest on his note, that he conferred with his attorney and, acting upon advice of his attorney, paid the interest up to April 25, 1910, $698.-64.

Plaintiff in error complains of the action of the trial court in submitting the cause to the jury, basing his contention upon the fact that this action was equitable and that the court should have tried it without the intervention of a jury, except the court could have called in a jury to answer interrogatories and to act in an advisory capacity.

It appears that the court submitted all the questions of fact to the jury. The jury returned a general verdict for the defendants; thereupon the plaintiff moved for a judgment non obstante veredicto, which motion was by the court overruled and judgment rendered in favor of the defendants.

This court has repeatedly held that in actions for the recovery of money on promissory notes, although involving the foreclosure of a mortgage on real estate, issue being joined as to the amount due, the defendant is entitled to a trial by jury. Sherman v. Randolph, 13 Okla. 224, 74 Pac. 102; Maas v. Dunmyer, 21 Okla. 434, 96 Pac. 591; Brewer et al. v. Martin, 40 Okla. 350, 138 Pac. 166; Holmes v. Halstid et al., 76 Okla. 31, 183 Pac. 969; Choctaw Lumber Co. v. Waldock, 78 Okla. 232, 190 Pac. 866.

The next question presented is whether or not an Oklahoma insurance corporation can issue its stock and accept the notes of its subscribers in payment therefor. Section 39 of article 9 of the Constitution of Oklahoma, in so far as it is germane, reads as follows:

"No corporation shall issue stock except for money, labor done, or property actually received to the amount of the par value thereof, and all fictitious increase of stock or indebtedness shall be void. * * *"

We cannot find that this court has ever construed this provision of the Constitution in so far as the question here involved is concerned. In Lee v. Cameron, 67 Oklahoma, 169 Pac. 17. wherein this section of the Constitution was under consideration, the court uses this language:

"This provision of our Constitution was intended by its framers and the people who adopted it to prevent the issuance by corporations of 'watered or fictitiously paid-up stock.' Since the primary object of interpretation is to ascertain the legislative intent, in a consideration of the provision under discussion we should keep clearly in mind the evil attempted to be prohibited. Cook, in his excellent work on Corporations, vol. 1, c. 3, p. 124, defines watered stock as it is generally understood in the following language: · 'Watered stock or fictitiously paid-up stock is stock which is issued as fully paid-up stock, when in fact the whole amount of the par value thereof has not been paid in. All stock which has been issued as paid-up stock, but the full par value of which has not been paid into the corporation in money or money's worth, is watered to the extent that the par value exceeds the value actually paid in. Watered stock is, accordingly, stock which purports to represent, but does not represent, in good faith. money paid into the treasury of the company, or money's worth actually contributed to the capital of the concern.' "

Therefore, the question is to be determined here is whether or not the note and mortgage sought to be enforced herein are property within the meaning and intention of this constitutional provision.

In some jurisdictions having constitutional or statutory provisions similar, if not identical with section 39, art. 9, supra, it has been held that a promissory note is not property actually received, within the contemplation of such constitutional or statutory provision, and that stock issued in exchange for the notes of the subscriber is void. McCarthy et al. v. Texas Loan & Guaranty Co. (Tex. Civ. App.) 142 S. W. 96; Mason v. First National Bank of Paint Rock (Tex. Civ. App.) 156 S. W. 366; Prudential Life Insurance Company of Texas v. Pearson (Tex. Civ. App.) 188 S. W. 513—holding that a note, by a deed of trust, is neither money paid nor property actually received within the meaning of the Constitution, art. 12, sec. 6, providing that no corporation shall issue stock except for money paid or property actually received. In Jefferson v. Hewitt (Cal.) 37 Pac. 638. the court, in discussing the effect of a note given in payment for stock, uses this language:

"The point is made that when the defendants received the certificate of stock they became liable to pay for it, and the condition agreed upon as to payment, if made, was rendered void, leaving the obligation to pay in full force. In support of this position, counsel cite section 359 of the Civil Code, which provides that 'no corporation shall issue stock or bonds except for money paid, labor done, or property actually received.' But if this section has any bearing on the case, it seems to us, it must be construed to render void the certificate, and not the condition as to payment, and hence that the note was made without consideration."

In other jurisdictions it is held that a note is property within the meaning of such constitutional or statutory provisions. Pacific Trust Co. v. Dorsey (Cal.) 12 Pac. 49; Meholin v. Carlson, 17 Idaho, 742, 107 Pac. 755, 134 Am. St. Rep. 286; German Mercantile Co. v. Wanner, 25 N. D 479, 142 N. W. 463; Schiller Piano Co. v. Hyde (S. D.) 162 N. W. 937. In Meholin v. Carlson, supra, the court says:

"Under the provision of section 9, art. 11, of the Constitution of Idaho, no corporation is permitted to issue stocks or bonds except for labor done, services performed, or money or property actually received. Held, that the promissory note received in payment of corporate stock is 'personal property,' was a thing in action or evidence of debt, and was a valid consideration given for the stock purchased by the appellant, and was an asset of the bank that might be collected for the purpose of discharging its debts."

It is apparent to us that it was not the intent of the framers of our Constitution, by section 39, art. 9, thereof, to limit the kind of property that might be received in payment for stock; but rather, to require that the actual value of the property so received should equal at least the par value of the stock, and that a corporation might receive real or personal property in payment for its capital stock, provided the property was such as the corporation might lawfully acquire and hold for carrying out the objects and purposes for which it was organized, or in which it was required by statute to invest its funds.

The Merchants & Planters Insurance Company was authorized by statute to invest 75 per cent. of its assets in loans upon improved and unincumbered real property in any state of the United States. Section 3444. Rev. Laws 1910. The note given by Smith to the company in payment of the stock was secured by mortgage upon real estate, and therefore was such property as the company

could, under the statute, acquire. It is not contended that the note and mortgage were not worth an amount equal to the par value of the stock issued.

In General Bonding & Casualty Ins. Co. et al. v. Moseley et al., 222 S. W. 961, the Supreme Court of Texas holds that:

"Note of a subscriber to corporate stock in an insurance company, secured by valid first mortgage on real estate to which the subscriber has title, accepted by the corporation in payment for the stock, is 'property actually received,' within the meaning of Const. art. 12, sec. 6, so that Acts 1919, c. 108, authorizing the incorporation of insurance companies whose capital consists of first mortgages on unincumbered realty in Texas is valid."

This case is the latest expression of the Texas courts upon this question, and if it does not overrule, at least it is not in accord with, the cases from the Civil Courts of Appeals of Texas cited and relied upon by the defendants in error. We conclude that the note and mortgage involved in the case at bar are property within the meaning of section 39, art. 9, of the Constitution, are not without consideration, and that the stock issued therefor is not void.

The plaintiff in error next contends that the defense of fraud cannot be urged in the instant case because it involves the question of rescission, and that there cannot be any rescission even in a case of fraud after the rights of creditors have intervened and the corporation has become insolvent and a receiver has been appointed therefor; and further urges that such defense cannot be urged in the instant case by the defendant because his contract of purchase of the stock of the corporation has been ratified by him, and because he has been guilty of laches in urging his defense of fraud; and in support of this threefold contention counsel for the plaintiff in error present, in their brief, arguments and authorities in support thereof as follows:

"Defendants in error contend that one of the remedies allowed to one who has been induced by fraud to purchase shares in a corporation is that the purchaser may wait until sued upon the subscription contract and then set up the alleged fraud as a defense. That is what has been attempted in this case. There is not, and has not been at any time, any effort on our part to dispute the proposition of law that one who has been defrauded may wait until sued upon the subscription contract and then set up fraud as a defense, but it must be remembered that that principle of law has its qualifications and limitations, and that we

have at all times relied upon those qualifications and limitations. If one who is sued on a stock subscription wishes to plead fraud as a defense, it must be shown to the court by him that he has not been guilty of laches; that the rights of innocent parties have not intervened or supervened; that he has not ratified or confirmed in any way the transaction. If the defendant fails in any of these respects, he cannot succeed in his defense even if it be true he has been defrauded. One who has been defrauded cannot sit idly by and allow any or all of the conditions to which we have just referred arise before he has been sued, and then when he has been sued claim the benefit of the alleged fraud. It does not, therefore, avail Simon Smith anything to say that he had the right to await the suit by the company on his note and mortgage, unless there is an utter absence of all the conditions and limitations to which we have just referred. Now, let us take up and discuss, first of all, the question of ratification. Did Simon Smith ratify this transaction? According to his own testimony, Mr. Smith learned in the fall of 1909 that the representations which were made to him were untrue. He also learned in the fall of 1909 that the company was in a very bad way financially; that if the stockholders, of which he was one, did not rally to the company's support with their money, there would be immediate bankruptcy. On the 21st day of April, 1910, by virtue of the suit filed in the district court of Tulsa county, Oklahoma, by the Insurance Commissioner of the State of Oklahoma against the Merchants & Planters Insurance Company, Mr. Smith learned that the company was hopelessly and helplessly insolvent. The ground of the suit was insolvency. The ground of the appointment of the receiver was insolvency. Mr. Smith himself says that on or after the appointment of the receiver and before May 10, 1910. he knew that the company was hopelessly insolvent. With all this knowledge before him he talked with Mr. Pattie, who had been an officer of the company for a long while, and sought Pattie's advice concerning the advisability of paying the interest on his note, the receiver of the company having made demand for the payment of the interest. Not only that, but Mr. Smith had an excellent attorney, Mr. J. W. Scothorn. He discussed with Scothorn the advisability of paying this interest. Scothorn advised him to make the payment. Smith then made the payment, which amounted to nearly $700. This payment was made by Mr. Smith with his eyes wide open, when he had full cognizance of all the things that he says showed fraud in the transaction he had with the company, and the ensuing insolvency of the company. Was there, at the time that Smith made this payment to the receiver, a single essential or vital thing that he (Smith) did not know? If so, what was it? Now, if he made the payment with knowledge of all the conditions, what was

the effect? The effect was to ratify and confirm the alleged fraud which he says was practiced upon him. What is the law on that subject? The rule is admirably stated in Corpus Juris. Here it is: '(77) R. Ratification of Affirmance. 1, Report. Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; and acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm. This doctrine seems to rest not upon the principle of a new contract between the parties, nor yet upon the ordinary principle of estoppel in pais, but rather upon a distinct principle of public policy, that all that justice or equity requires for the relief of a party having such cause to impeach a contract is that he should have but one fair opportunity, after full knowledge of his rights, to decide whether he will affirm and take the benefits of the contract, or disaffirm it and demand the consequent redress. Any other rule would be regarded as unjust, even toward the party guilty of the wrong out of which grows the right to rescind'. 9 Corpus Juris, page 1198, first column.

"Cook on Corporations (7th. Ed.) vol. 1, sec. 160, reads in part as follows: '160. Ratification as a Bar to the Subscriber's Remedies. A subscription contract obtained by fraudulent representations may cease to be voidable and may become absolutely binding by acts of ratification. Any act of the subscriber, inconsistent with an intention to disaffirm the contract will constitute a ratification of the subscription and a waiver of the right to avoid it by reason of fraud, provided the subscriber knew of the fraud at the time of such ratifying act."

"Vol. 9, Corpus Juris, page 1198, sec. 78, reads in part as follows: '78. What Amounts to Ratification—a. In General. The following acts on the part of the party claiming to be injured have been held to be acts of recognition affirming the transaction: On the part of the party to a building contract, going on and fully performing the contract after discovery that the other party had fraudulently misrepresented the amount of work to be done; on the part of a purchaser, payment of purchase money after knowledge of the fraud; the execution of a mortgage on the property, by the purchaser, with full knowledge of the fraud for which rescission is asked; receipt of purchase money on the part of a vendor; bringing suit for unpaid purchase money; bringing dismissal of a suit brought to set aside the suit for a specific performance; voluntary dismissal of a suit brought to set aside the instrument; failure of the purchaser to repudiate the contract when the fraudulent

vendor demanded the price; where the ground for cancellation was nonperformance by the vendor, giving an extension of time for the removal of incumbrances; and in general, any transactions with defendant relating to the subject-matter of the contract and inconsistent with an intention to rescind.'

"In support of the proposition laid down by Corpus Juris that in general any transaction relating to the subject-matter of the contract and inconsistent with the intention to rescind amounts to ratification, a number of cases are cited in notes on page 1199 of the volume just referred to. These cases are from the United States Supreme Court and other federal courts, and from the courts of last resort in Alabama, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Mississippi. New York, Tennessee and Texas.

"In the case of Hattie Rothschild et al. v. Title Guarantee & Trust Co., New York Court of Apeals, L. R. A. (N. S.) volume 41, page 744, near the middle of the second column, the court says: * * * 'When a party with full knowledge, or with sufficient notice of his rights and of all material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable.' This was a case where a property owner claimed that her name was forged to a mortgage, but she paid the interest on the mortgage, and the court said she ratified it. Baldwin F. Strauss, son of Caroline Strauss, forged her name to a bond and mortgage and obtained on said forged instruments, $2,000.00. A year or more after this, the mother learned of the forgery, and thereafter she paid six months' interest on the debt; but the court said she was bound, because by the payment of the interest she had ratified the instrument.

"Vol. 4, Ruling Case Law, beginning at the bottom of page 514, says: 'The rule is that where a party has been induced to enter into a contract by false and fraudulent representations, he may, upon discovering the fraud, rescind the contract; but the great weight of authority holds that if the party defrauded continues to receive benefits under the contract after he has become aware of the fraud, or if he otherwise conducts himself with respect to it as though it were a subsisting and binding engagement, he will be deemed to have affirmed the contract and waived the right to rescind.'

"In the case of City Light, Power, Ice & Storage Company v. St. Mary's Machine Company, decided April 7, 1913, by the Kansas City Court of Appeals and rehearing de-

nied May 5, 1913, reported in 155 Southwestern Reporter on page 86, this statement is made: 'Undoubtedly it is settled law that where a party with full knowledge of the facts, has, distinctly and unequivocally, done any act which implies an intention to abide by the contract, he cannot subsequently disaffirm the contract and sue either at law on a rescission or in equity for one. 9 Cyc. 436; Taylor v. Short, 107 Mo. 384, 17 S. W. 970; Harns v. Wolf, 114 Mo. App. 387, 89 S. W. 1037.'

"Counsel for defendants in error seem to lay great stress upon the idea that intention to ratify is one of the essential elements of ratification, but they cite no case to maintain any such position. You will find this proposition set forth by them on pages 55, 56 and 57 of their brief, but they do not cite a single authority—case or text-writer—to maintain any such position. We affirm that that is not the law. If it were, then it would be possible for any person to come into court at any time and say: 'I did not do this alleged act of ratification with the intent to ratify.' It is a question of knowledge, but it is not a question of intent. If the person claiming to have been defrauded had knowledge of the facts of the alleged fraud at the time of the alleged act of ratification, then he is bound by his act of ratification. It make no difference, whether he intended to ratify or not. The fact remains that he does ratify by his act. When a man acts with knowledge he must abide the consequences of his act. Not what he means to do controls, but what he actually does is what controls. In this case Simon Smith had full knowledge of the facts when he made the payment to Harn, and in addition thereto he had the advice and counsel of his attorney, a most excellent lawyer. It would indeed be strange doctrine of the law that would permit Mr. Smith to say: 'I did not mean to ratify or confirm the purchase of this stock by the payment of the interest on the note and mortgage.' As a matter of fact Mr. Smith did not say in his testimony that it was not his intention to affirm the transaction. But whether he did or not is wholly immaterial. He acted with full knowledge. and he is bound by his act."

While we agree with counsel in very much that they have said in support of the general rule stated, yet we heartily concur in the exceptions to the general rule as announced in 14 Cyc. 588 in the following language:

"But where the corporation at the time of the making of the note and the transfer of the stock was insolvent, the maker thereof may set up by way of defense a fraudulent representation of the corporation and a want of consideration against the receiver as well as against the corporation—" citing

in support thereof, Litchfield Bank v. Peck, 29 Conn. 384.

On the same and succeeding page, 589 (14 C. J.), the text continues:

"If a person is induced to subscribe for or to purchase stock in a corporation by fraud on the part of its directors or managing officers or on the part of any other agent for whose act the corporation is responsible, the effect is to render the contract not void but merely voidable at the election of the subscriber or purchaser. It subsists in full vigor until repudiated by him or some distinct act or expression, or until rescinded by a decree of a court of competent jurisdiction. Until he exercises his option to rescind the contract, assuming that he has a right to rescind, he remains a stockholder of the corporation for all purposes. In such a case the subscriber or purchaser has various rights and remedies as will be shown in the following sections:

"(864) (2) Recovery of Damages. In the first place where there is actual fraud and injury, the party defrauded is entitled, as in other cases of fraud, to recover the damages which he has sustained by reason of the fraud by action at law or in equity. according to the circumstances, or by set-off or counterclaim, against the corporation, or against the directors, managing officers, or other agents, promotors, or other persons guilty of the fraud, whether they have received any benefit from the fraud or not, or against both and all. And his right to recover damages for the decei exists whether he ratifies or rescinds the contract, unless, in the former case, his acts in affirmance of the contract are such as to condone the fraud and waive his right of action."

The author cites in support of the text supra, decisions of the courts of last resort from England Canada, United States courts, and practically every state in the Union, which doctrine has been approved by this court in the cases of Gast v. King et al., 27 Okla. 554, 112 Pac. 997, and Ardmore National Bank v. Briggs Machine & Supply Co., 20 Okla. 427, 94 Pac. 533. In the latter case, opinion by Mr. Justice Kane, in the first paragraph of the syllabus it is said:

"The receiver of an insolvent nongoing corporation takes the property of the company for the creditors, subject to such equities, liens or incumbrances, whether created by operation of law or by act of the corporation, which existed against the property at the time of his appointment."

And also the case of Lawson, Receiver, v. Warren, 34 Okla. 94, 124 Pac. 46, wherein Rosser Com., speaking for the court, said:

"The receiver stands in the shoes of the Arnold Mercantile Company. His right is not greater than theirs. If the plaintiff had priority as against the Arnold Mercantile Company, he has the same right against the receiver. * * * "Assignees, trustees in bankruptcy, and receivers are not purchasers for value, and take the estate of an insolvent subject to all set-offs, liens, and incumbrances in the plight existing at the date to which his title is ultimately referred.'"

In Thompson on Corporations, vol. 5, sec. 5158, the author states:

"The view sustained by many of the courts is that unless the receiver's powers are enlarged by statute, he succeeds to no right of action which the corporation itself did not possess. Tersely stated, his powers and authority are no greater than those of the corporation itself, and this rule has been generally applied in this country and in England."

Cyc. lays down the rule under the head of Receivers, volume 34, page 495:

"Pursuant to the general rule that the mere appointment of a receiver does not affect rights ultimately to be determined, that the receiver takes only the right and interest of the original owner, or the right of action of the party whose interest he is appointed to represent, it follows that defenses which might have been made against the party over whose property the receiver is appointed, or whose title to or whose interests are represented by the receiver, may be interposed against him. So a receiver of a corporation takes its assets subject to the conditions and legal disabilities with which it was trammeled in the hands of the corporation, and causes of action in the right of a corporation are subject to the defenses which might have been available against it."

23 Ruling Case Law, section 128, page 121, under the head of Receivers, says:

"The general rule is well established that a receiver takes the title of the corporation or individuals whose receiver he is, and that any defense which would have been good against the former may be asserted against the latter."

In 1 Thompson on Corporations, sec. 753, it is said:

"The rule recently established in England is that where the subscriber sets up fraud as a defense to an action on the subscription, he is not required to plead repudiation since the discovery of the fraud, but the corporation must show acquiescence after knowledge of such fraud—" citing Aarons Reefs v. Twiss, (1896) A. C. 273.

In 14 Corpus Juris, page 600, it is said:

"There is so much confusion in the opinions of the courts and such conflict in the cases, that no fixed general rule can be said to have been established. In some cases an absolute rule like that established in England has been laid down or recognized. In other cases the courts have merely found elements of estoppel in the circumstances aside from the question of laches, and have held that, where a considerable time has elapsed since the subscription or purchase was made, or where the subscriber or purchaser has actually participated in the management of the affairs of the corporation, has stood by and permitted it to contract debts, or has received dividends or otherwise enjoyed the benefits of his relation as a stockholder, he cannot rescind and recover what he has paid or escape liability for what may be due from him, after the corporation has become insolvent * * * even though he has been guilty of laches in discovery, but if none of the above conditions exists and the proof of the alleged fraud is clear, a rescission should be allowed as well after as before the corporation has become insolvent and ceased to be a going concern—" citing Wallace v. Bacon, 86 Fed. 553; Newton National Bank v. Newbegin, 74 Fed. 135, 33 L. R. A. 727; Reid v. Owensboro Savings Bank, 141 Ky. 444, 132 S. W. 1026; Kentucky Mutual Investment Co. v. Schaefer, 120 Ky. 227, 85 S. W. 1098, 27 Ky. L. 657; Morrisey v. Williams, 74 W. Va. 636, 82 S. E. 509, L. R. A. 1915D, 792; and continuing: "In other cases, since it is considered that creditors have no equity superior to that of an innocent stockholder whose subscription of purchase has been procured by fraud, and who is absolutely free from any imputation of laches, it seems to be held broadly that he may rescind for the fraud under such circumstances even after the insolvency of the corporation and as against a receiver, an assignee for the creditors, or a trustee in bankruptcy or insolvency, as the case may be—" citing People v. California Safe Deposit, etc., Company, 19 Cal. App. 414, 126 Pac. 516; Johns v. Coffee, 74 Wash. 189, 133 Pac. 4; Wallace v. Bacon, supra; Merrill v. Florida Land, etc., Company, 60 Fed. 18; Florida Land, etc., Company v. Merrill, 52 Fed. 77; Beal v. Dillon, 5 Kan. App. 27, 47 Pac. 317; Ramsay v. Thompson Mfg. Co., 116 Mo. 313, 22 S. W. 719; Robinson v. Dickey, 14 Tex. Civ. App. 70, 36 S. W. 499.

Concerning the question of fraud and deceit practiced in the procurement of a contract and the effect of such fraud, Pomeroy on Equity Jurisprudence, vol. 2, sec. 889, states:

"The destructive effect of fraud on any contract, covenant or other transaction is so essential and far-reaching that no person, however free from a participation in the fraud, can avail himself of what has been obtained by the fraud of another un-

less he is not only innocent, but has given some valuable consideration."

And quoting from the note which is a quotation from an English case, wherein the chancellor said:

"I take it to be clear that no person, however innocent he may himself be, can, where there is no valuable consideration, derive a title under the fraud of another."

In the case of United States v. Libelants & Complainants of the Schooner Amistad, reported in 15 Pet. (U. S.) 518, 10 L. Ed. 826, Mr. Justice Story, speaking for the court, says on page 854 of 10 L. Ed.:

"This posture of the facts would seem, of itself, to put an end to the whole inquiry upon the merits. But it is argued, on behalf of the United States, that the ship and cargo, and negroes, were duly documented as belonging to Spanish subjects, and this court has no right to look behind these documents; that full faith and credit is to be given to them; and that they are to be held conclusive evidence in this cause, even though it should be established by the most satisfactory proofs that they have been obtained by the grossest frauds and impositions upon the constituted authorities of Spain. To this argument we can, in no wise, assent. There is nothing in the treaty which justifies or sustains the argument. We do not here meddle with the point whether there has been any connivance in this illegal traffic on the part of any of the colonial authorities or subordinate officers of Cuba; because, in our view, such an examination is unnecessary, and ought not to be pursued, unless it were indispensable to public justice, although it has been strongly pressed at the bar. What we proceed upon is this, that although public documents of the government, accompanying property found on board of the private ships of a foreign nation, certainly are to be deemed prima facie evidence of the facts which they purport to state, yet they are always open to be impugned for fraud; and whether that fraud be in the original obtaining of these documents, or in the subsequent fraudulent and illegal use of them, when once it is satisfactorily established it overthrows all their sanctity and destroys them as proof. Fraud will vitiate any, even the most solemn transactions, and an asserted title to property, founded upon it, is utterly void."

Again, the federal Supreme Court, in the case of Stoddard et al. v. Chambers, reported in 2 How. 284, 11 L. Ed. 269, quoting from page 283 of 11 L. Ed., Mr. Justice McLean, speaking for the court, says:

"It is true a patent possesses the highest verity. It cannot be contradicted or explained by parol, but if it has been fraudulently obtained or issued against law, it is void. It would be a most dangerous principle to hold that a patent should carry the legal title, though obtained fraudulently or against law. Fraud vitiates all transactions. It makes void a judgment, which is a much more solemn act than is the issuing of a patent."

In Hooker & Wishart v. Wilson, 69 Oklahoma, 169 Pac. 1098, in syl. par. 3 it is stated as follows:

"Fraud and deceit always may be timely raised, and vitiate every contract into which they are injected. and destroy the validity of everything into which they enter, and the party cannot hide behind a contract procured in the general scheme of his misconduct with the assertion that all representations whether false or otherwise made previous to a written contract, are merged therein."

In High on Receivers, sec. 245, the rule is stated:

"Since the appointment of a receiver in limine does not affect any question of right involved in the action, and does not change any contract relations or rights of action existing between parties, it follows as a general rule that in ordinary actions brought by a receiver in his official capacity, to recover upon an obligation or demand due to the person or estate which has passed under the receiver's control, the defendant may avail himself of any matter of defense which he might have argued had the action been brought by the original party, instead of by his receiver"—citing Williams v. Babcock. 25 Barb. (N. Y.) 108; Bell v. Shibley. 33 Barb. (N. Y.) 610; Savage v. Medbury, 19 (N. Y.) 32; Shaughnessy v. The Rensselaer Insurance Company. 21 Barb. (N. Y.) 605; Moise v. Chapman, 24 Ga. 249; Davendorf v. Beardsley, 23 Barb. (N. Y.) 656; Thomas v. Wallon, 31 Barb. (N. Y.) 172; Colt v. Brown, 12 Gray (Mass.) 233; Van Wagoner v. Patterson Gas Light Co., 3 Zab. (N. J. Law) 283; Berry v. Brett, 6 Bosw. (N. Y.) 627; Hyde v. Lynde, 4 (N. Y.) 387.

It is said in the case of West End Real Estate Company v. Claiborne, by the Supreme Court of Appeals of Virginia, reported in 34 S. E , page 900, in the fifth paragraph of the syllabus, after stating the facts wherein fraud was practiced upon a purchaser:

"* * * And in an action on his subscription, defendant denied liability because of such false representations, and it appeared that after their falsity was known to him the corporation arranged to eliminate such promoter's interest, defendant was not precluded from such defense by his failure to promptly repudiate his contract on learning of the falsity of such representations."

It was held in the case of Marion Trust Company, Receiver of Vernon Insurance & Trust Company, v. Tipton's Blish, by the Supreme Court of Indiana, 84 N. E. 814, L. R. A. (N. S.) 347, in the first paragraph of the syllabus:

"A defense of fraud in procuring a subscription to stock of a corporation cannot be prevented in an action by a receiver on the subscription note, based on the title of the corporation thereto, because the rights of some of the corporate creditors attached subsequently to the making of the note."

And in paragraph 5 of the syllabus, the court said:

"An action on a stock subscription by a receiver of the corporation must be based on the title of the corporation, and the court cannot charge the receiver with the further duty of representing creditors whose rights are personal and antagonistic to his."

In the case of Curtis v. Leavitt, 15 N. Y. 944, the court said:

"So far as shareholders are concerned, he can litigate respecting the fraud upon precisely the grounds which would be available to the corporation, if it were still in existence, solvent, and no receivership had been constituted.

It was also said in Smith v. Johnson, 57 Ohio St. 488, 49 N. E. 694:

"We suppose that the position of the receiver in this kind of an action does not admit of serious question. While, speaking in general terms, he is a trustee for creditors, and for stockholders as well, in respect to their interest in the property and assets of the corporation, resting upon the fact that they are, or may be, the beneficiaries of the fund which he collects, yet he stands, in a suit against stockholders, as the representative of the corporation, taking the rights of corporation such as could have been asserted in its name, and on that basis only can he litigate. Smith, Rec. sec. 231. That is, he succeeds to the title and rights of action of the corporation itself, and takes all such rights as the corporation itself originally had, and may enforce them by the same legal remedies. 23 Am. & Eng. Enc. Law, 827; High, Rec. secs. 315, 316; Winters v. Armstrong, 37 Fed. 508; Insurance Co. v. Swigert, 135 Ill. 150, 25 N. E. 680."

Further quoting Marion Trust Co. v. Blish, supra, on page 352, 18 L. R. A. (N. S.), it is said:

" 'Of course, in the collection of such subscription he is invested, in this respect, with no greater power than that which the corporation possessed, and is bound precisely in the same manner as it was'—citing Beach, Priv. Corp., secs. 716, 717, 772; Beach, Receivers, sec. 669; Billings v. Robinson, 94 N. Y. 415; Coffin v. Ransdell, 110 Ind. 417, 11 N. E. 20; State ex rel. Shepard v. Sullivan, 120 Ind. 197, 21 N. E. 1093, 22 N. E. 325;

Bruner v. Brown, 139 Ind. 600, 38 N. E. 318; Rummer v. Dwiggins, 147 Ind. 238, 36 L. R. A. 645, 46 N. E. 580.' " See, also, Ellison v. Ganiard, 167 Ind. 471, 79 N. E. 450.

The fact relied upon by counsel for plaintiff as to ratification and waiver is the payment by defendant Smith of the interest due upon the note, made a few days after the appointment of the receiver. They say that by such payment he ratified the fraudulent contract, and that it makes no difference whether he intended to ratify or not; that "not what he means to do controls, but what he actually does is what controls." Concerning this payment, Mr. Smith testified as follows:

"I was advised by my attorney to pay it. By so doing I would never need to pay the mortgage nor my note."

And in answer to the question as to who his attorney was, he said:

"Mr. Scothorn. I remonstrated all the time as being contrary to my wishes."

On cross-examination, he testified as follows:

"Q. Then you went and conferred with Mr. Scothorn, an attorney in this case? A. Yes. Q. He was your attorney? A. Yes. Q. He advised you to pay the interest? A. Yes; and if you will pardon me right here, Mr. Pattie, when I got word when I had employed my attorney, Mr. Scothorn, I asked for Mr. Pattie and told him what had happened, that I had gotten a notice and told him how it was. I said I was never to pay interest or principal at all out of my own funds; that it was to be paid out of the company, and he said: 'Don't you pay that interest.' Q. Who was it that told you not to pay the interest—Pattie? A. Yes; he said, 'You don't have to pay that,' and he wanted me to hire Colonel Sleeper to fight the case, but I had already hired Mr. Scothorn, so you see where I stood at that time. Q. As I understand, you and Mr. Scothorn discussed the matter and you thought it was not right to pay the interest? A. Yes, I thought it was always a bad idea. Q. And Mr. Scothorn told you that you should pay it? A. Yes; he said: 'If you pay this I can fight that along so you never will have to pay any interest on your principal and they cannot collect it out of you.' Q. That was the interest that you owed on this ten-thousand-dollar note from the time the note was executed up until the 25th day of April, 1910, when the receiver was appointed? A. I did not understand it that way; I did not understand that I owed it. * * * Q. All that was due up to the appointment of the receiver, was it not? A. In order to clear the claim."

The question of ratification and waiver generally is a question of fact to be determined by the jury. It involves the question of intent. On this subject, in 40 Cyc. 260, it is said:

"The question of waiver is mainly a question of intention, which lies at the foundation of the doctrine. * * * Since intent is an operation of the mind it should be proven and found as a fact, and is rarely to be inferred as a matter of law."

On page 260 it is said, under the head of Weight and Sufficiency:

"It is also necessary that the acts, conduct, or circumstances relied upon should make out a clear case of waiver."

And on page 270, under the head of Question of Law and Fact, note 52:

"It is the duty of the court to charge and define the law applicable to waiver, but it is the province of the jury to say whether the facts of the particular case constitute waiver as defined by the court."

This question was given full consideration by this court in the case of St. Louis & S. F. R. Co. v. Ladd, 33 Okla. 160, 124 Pac. 461, where Mr. Justice Kane reviewed various authorities and in the fifth paragraph of the syllabus stated:

"Where there is evidence tending to show that the freight claim agent of a common carrier receives a claim for damages to a shipment of live stock after the time limited by a clause of the shipping contract requiring notice, which has not been complied with ... n... 'n ,el, a s expired, trea.s it as pending and then rejects it on other grounds, the question of whether the carrier intends to waive the notice clause is a question of fact for the jury."

It was said in the case of Pence v. Langdon, reported in 99 U. S. at page 578, 25 L. Ed. 420, by the Supreme Court of the United States, speaking through Mr. Justice Swayne, in the fourth paragraph of the syllabus:

"Acquiescence and waiver are always questions of fact. There can be neither without knowledge. Current suspicion and rumor are not enough."

Thompson on Corporations, vol. 1, sec. 751, states:

"So, there may be circumstances which would prevent the acts done from being a ratification even with knowledge of the fraud. Under this principle it may be said that the acts done by the subscriber in order to protect himself, or to reduce the damages even with the knowledge of the fraud, should not have the force of a ratification."

A rule recently established in England is that where the subscriber sets up fraud as a defense to an action on the subscription, he is not required to plead repudiation since the discovery of the fraud, but the corporation must show acquiescence after knowledge of said fraud. 1 Thompson on Corporations

(2nd Ed.) 754; 1 Cook on Corporations, sec. 162; Virginia Land Co. v. Haupt, 90 Va., 533, 19 S. E. 169, 44 Am. St. Rep. 939; London, etc., Insurance Co., In re, 24 Ch. Div. 149.

As we have seen, the defense of fraud was clearly established by the evidence; in fact, counsel for the plaintiff nowhere in the record dispute that question, and it seems clear to us from the foregoing authorities that the trial court properly allowed such defense to be urged by the defendant, and in that committed no error. The strongest feature in this case in favor of the right of plaintiff to recover is upon the ground of ratification or waiver. This issue was clearly made, and was submitted to the jury upon proper instructions of the court. The jury having found in favor of the defendant, which finding has been approved by the trial court, and is abundantly sustained by the testimony, this court is without authority to disturb such findings. Bunker v. Harding et al., 70 Oklahoma, 174 Pac. 749; Blasdel et al. v. Gower, 70 Oklahoma, 173 Pac. 644; Shawnee Nat. Bank v. Pool, 66 Okla. 145, 167 Pac. 994; Chicago, R. I. & P. Ry. Co. v. Pruitt, 67 Okla. 219, 170 Pac. 1143.

The contention of plaintiff's counsel that the defendant had been guilty of laches, and should thereby be precluded from a recovery, is without merit. The record shows that a little over a year after the subscription contract was made, the company went into the hands of a receiver; there is some intimation in the case-made that Smith's attorneys requested the receiver to file suit so that he might have an opportunity to defend. Smith had been advised by his attorney that by paying the $600 everything would be settled; he would hear no more of the matter; that this would enable him to fight the case successfully, and he would never have any more to pay. So far as the record shows, he heard no more about the matter until practically five years later, when the suit was filed, February 1, 1917. He then filed his answer, setting up fraud and failure of consideration. It was not shown that there was any additional indebtedness created after he discovered the fraud, and none could be, because the receiver was in charge. Neither the receiver nor the creditors were placed at any disadvantage or sustained any detriment on account of nonaction on the part of the defendant.

As we have already seen, as was held by this court in the case of Gast v. King et al., 27 Okla. 554, the defendant Smith elected to avail himself of one of the five different remedies that were open to him; that is, he waited until he was sued upon his subscrip-

tion and then set up the fraud as a defense to such action at law, and the fact that the receiver waited some five years before suing the defendant, during which time the defendant remained passive, did not constitute laches on the part of the defendant. The general rule is that delay without injury does not constitute laches.

Quoting from Words and Phrases, vol. 5, page 3969 et seq., we find the following:

" 'Mere acquiescence, if by "acquiescence" is to be understood only abstaining from legal proceedings, is unimportant. Where one party invades the right of another, the other does not in general deprive himself of the right of seeking redress, merely because he remains passive, unless, indeed, he continues inactive so long as to bring the case within the purview of the statute of limitations.' Wood on Limitations, sec. 62; Lux v. Haggin (Cal.) 10 Pac. 674, 678; Kenyon v. National Life Ass'n, 57 N. Y. Supp. 60, 74, 39 App. Div. 276."

"Laches is not, like limitation, a mere matter of time. but principally a question of the inequity in permitting the claim to be enforced; an inequity founded upon some change in the conditions, or the relations of the property or the parties. Coosaw Min. Co. v. Carolina Min. Co. (U. S.) 75 Fed. 860, 868; Nantahala Marble & Talc Co. v. Thomas (U. S.) 76 Fed. 50, 64; Wheeling Bridge & Terminal Ry. Co. v. Yarmann Brewing Co. (U. S.) 90 Fed. 182, 189, 195, 32 C. C. A. 571."

" ' Laches' is a term of flexible import, and whether it exists in a given case depends upon facts and circumstances peculiar to that case. It means something more than mere delay; some other element must be connected with the delay to constitute laches, and hence in some cases a party has been concluded by a delay of months, or even weeks, while in other cases his rights have been held unaffected by a delay of years. The question ordinarily is whether, during the period of delay, such changes have taken place in the position of the parties relative to the subject-matter in litigation as to render it inequitable to permit the enforcement of rights concerning which otherwise there might be no difficulty. Dubois v. Clark, 55 Pac. 750, 753, 12 Colo. App. 220. * * * Parker v. Bethel Hotel Co., 96 Tenn. 252, 32 S. W. 209, 217, 31 L. R. A. 706."

" 'Laches', in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within the limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has in good faith become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against

the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes, but when a court sees negligence on one side, and injury therefrom on the other, it is a ground for denial of relief. Chase v. Chase, 20 L. R. A. 202, 37 Atl. 804 (cited and approved in Graham v. Sayles, 50 Atl. 848, 850. 23 R. I. 449)."

"Two circumstances, always important to be considered, are the length of the delay, and the nature of the acts done during the interval. which might affect either party. Hall v. Otterson, 28 Atl. 907, 912, 52 N. J. Eq. (7 Dick) 522."

"The question of laches turns not simply upon the number of years which have elapsed between the accruing of the right and the assertion of it, but also upon the nature and evidence of the right, the changes of value, and of circumstances occurring during that laspe of years. Galliher v. Caldwell, 12 Sup. Ct. 873, 874, 145 U. S. 368, 36 L. Ed. 738.*** People v. Scannell, 59 N. Y. Supp. 679, 680, 27 Misc. Rep. 662. * * * Hellans v. Prior, 64 S C. 296, 42 S. E. 106, 107. * * * Bell v. Wood, 94 Va. 677, 27 S. E. 504. 506 * * * Hamilton v. Dooly, 15 Utah, 280, 49 Pac. 769, 772. * * * First National Bank v. Nelson, 106 Ala. 535, 18 South, 154, 155."

"The defense of laches is an equity only permitted to defeat an acknowledged right on the ground that it affords evidence that the right has been abandoned. Vottrell v. Watkins, 17 S. E. 328, 331, 80 Va. 801. 19 L. R. A. 754, 27 Am. St. Rep. 897.* * * Babb v. Sullivan, 43 S. C. 436 21 S. E. 277, 279. (cited in Wagoner v. Saunders, 39 S. E. 950, 955. 62 S. C. 73) * * * Demuth v. Old Town Bank, 85 Md. 315. 37 Atl. 266, 60 Am. St Rep. 322."

The foregoing principle was recognized by this court in the case of Clark v. Duncanson, 79 Okla. 180, 192 Pac. 806, where, in the body of the opinion by Ramsey, J., this court quoted with approval, the Supreme Court of California, the case of Hart v. Church, 126 Cal. 471, 58 Pac. 910, 77 Am. St. Rep. 195, as follows:

"It is also true that, where a party seeks relief upon the ground of fraud or mistake, the action must be commenced within three years after the discovery of the facts constituting the fraud or mistake; but a different case is presented where the party who has procured the fraudulent contract, or who seeks to take advantage of it, asks to have it declared valid or to enforce its executory terms. and is thus himself asking affirmative relief. The three-year statute of limitations does not bar the defendant in such a case from objecting to the validity or to the enforcement of the contract upon the ground of fraud. It is not incumbent upon one who has thus been defrauded to go into court and ask relief, but he may abide his time. and when enforcement is sought against him excuse

himself from performance by proof of the fraud. Of course, in such a case he incurs the risk of defeat by the intervention of the rights of innocent parties."

Again, in the body of the opinion, Mr. Justice Ramsey quotes from the Supreme Court of Missouri, in the case of Butler v. Carpenter, 163 Mo. 597, 63 S. W. 823, wherein the court said:

"The third ground of demurrer, 'That defendant's alleged equitable title is stale and barred by the statute of limitations,' may also be disposed of by the simple suggestion that the sole purpose of the statute of limitations, by its very language, is to bar actions, and not to suppress or deny matters of defense, whether equitable or legal, and that, too, when, as in this case, the equitable defense is accompanied by a prayer for affirmative relief. The purpose of the statute is to quiet the assertion of old, stale, and antiquated demands, but it has never been thought that its intended object was to go further, and to deny a just and meritorious defense, whether the facts of that defense had their birth in the first, tenth, or twentieth year before the call for the assertion of those facts was made necessary by some hostile claim, demand, or proceeding. A ground of defense never becomes stale or barred by the statute of limitations, but grows in strength and force as the limitation period against a right of action widens. The statute of limitations may be used by a defendant as a shield for his protection or defense, but is never to be turned upon him as a sword with which to compass his defeat."

Further on in the opinion he said:

"If the defenses to an action to quiet title commenced by the holder of the tax deed are not barred by the statute of limitations, it seems clear that a mere judgment dismissing plaintiff's suit, and not awarding defendant possession, renders nugatory the very defenses the law holds to be good. Thus we would have the law saying to a defendant: 'Your defenses are good, they are not barred by the statute of limitations, and from your defenses it appears that plaintiff has no valid title, and while I find you have the title and plaintiff has no title, I can do nothing except leave the plaintiff in possession.' This would be to keep the word of promise to the ear, while breaking it to the hope. It was not necessary for the defendant to ask for cross-relief in order to defeat the plaintiff. See 17 Ency. Pl. & Pr. 354"--citing 6 Standard Proc. 300; Bacon v. Rice, 14 Idaho, 107, 93 Pac. 511; Johnson v. Taylor, 150 Cal. 201, 88 Pac. 903, 10 L. R. A. (N. S.) 818, 119 Am. St. Rep. 181; Dupuy v. Selby, 76 Okla. 307, 185 Pac. 107.

Counsel for plaintiff complain in their brief that there was no offer of a tender on the part of the defendant Simon Smith to return the certificate of stock before suit. No such a tender was a necessary prerequisite to maintaining such defense. Had a tender of the stock been made to the receiver and a demand made for the release and surrender of his mortgage, it would have been an idle ceremony. Such was the holding of the Supreme Court of the U. S. under similar circumstances in the case of Lantry, Plaintiff in Error, v. Wallace, Defendant in Error, Receiver, 182 U. S. 536, 45 L. Ed. 1218, wherein, in speaking of a tender of stock and a demand that the receiver cancel it, Mr. Justice Harlan said:

"Such tender was an idle ceremony, and added nothing to the rights of the defendant; for the receiver had no power to accept or cancel the certificate or to relieve the defendant from the responsibility attaching to him as one appearing upon the books of the bank as a shareholder and to whom had been accorded by the bank the privilege of a shareholder. His duty was to take charge of the assets of the bank and to enforce such assessment upon the shareholders as was made by the comptroller in virtue of the statute."

Finding no reversible error in the record, the judgment of the trial court is affirmed.

HARRISON, C. J., PITCHFORD, V. C. J., and ELTING and KENNAMER, JJ., concur; McNEILL and NICHOLSON, JJ., dissent; KANE and MILLER, JJ., not participating.