**AUSTIN, Bank Com'r of Texas, v. SOUCEK.**

No. 18664.   Opinion Filed Nov. 20, 1928.

McKeever, Moore & Elam and A. C. Glenn, for plaintiff in error.

J. B. Drennan and Sam P. Ridings, for defendant in error.

HALL, C.  The essential facts in the case are as follows: The defendant, C. H. Soucek, during the years 1910, 1911, and 1912, tem-

porarily resided at or near El Campo, Tex., where he taught school and worked on a rice plantation. In 1912 a man named Marshall organized a bank at El Campo, Tex., which institution was styled the "Citizens State Bank of El Campo." At or about the time of its organization, the defendant was induced to purchase some stock in this bank. Immediately thereafter the defendant removed from the state of Texas to his farm in Grant county, Okla. This bank was a one-man corporation; that is to say, its principal owner was Marshall, who was its president, and who superintended the management of all its affairs. In June, 1920, this banking corporation, through its president, Marshall, wrote a letter, or series of letters, to the defendant, stating that it was necessary to increase the capital stock of the bank from $62,500 to the sum of $100,000, in order to take care of and hold the enormous deposits in the bank. His letters indicated (according to testimony) that the bank was in a flourishing condition. He requested and urged the defendant to subscribe for additional stock in the bank to the amount of approximately $10,000. On the basis of these representations, the defendant did subscribe for additional stock in the amount of approximately $9,500, for which he paid $7,000 in cash, and executed a note in the sum of $2,500, representing the balance due for the stock. This note is the subject of this controversy. In November or December of the same year (1920), the defendant learned that the bank was wholly insolvent, and in December, 1920, the bank was declared such, and was taken over by the proper liquidating officer for defunct banks in the state of Texas. At the time the defendant was induced to purchase this additional stock, for which he paid $7 000 in vash and executed this not in controversy in the sum of $2,500, the bank was insolvent. It had about $800,000 in worthless loans, and its cashier testified at the trial of this case that the b nk at that time, in his opinion, was wholly insolvent. The defendant refused to pay this additional $2,500 for the stock on the ground that he was induced to subscribe for the stock by fraudulent representations made to him by Marshall, the president and managing officer of the bank. He did not bring an action to rescind the entire stock subscription, and to recover back the $7,000, because it appeared to the defendant that the bank was so completely wrecked that such remedy would be entirely fruitless.

The banking commissioner, in bringing this action against the defendant, alleged that is was necessary to collect this note "for the purpose of paying the claims, debts, and obligations against said insolvent bank, and for the purpose of paying the depositors of said bank." There is no evidence in the record tending to show that any of this indebtedness was created subsequently to the subscription and purchase of this stock by the defendant, which was in June, 1920. The evidence shows that there was no consideration for this note except the stock certificates, and that same were without value and absolutely worthless; and that the defendant had repudiated the transaction at the first opportunity after he learned that the institution was insolvent.

Several distinct assignments of error are urged, but the principal ones necessary for consideration here present the following questions:

First. After a corporation has become insolvent, and in an action by its receiver or liquidating agent to recover from a shareholder for an unpaid balance on a stock subscription, can the shareholder as a defense to such action set up fraud on the part of the corporation as an inducement to the purchase of the stock?

Second. If the above question is to be answered in the affirmative, upon whom lies the burden of showing (by pleading and proof) the situation regarding the rights of innocent third parties, if any; that is, creditors of the corporation who became such after the subscription to the stock sought to be rescinded or payment therefor avoided?

The authorities controlling the first question appear to be considerably at variance. This, however, is more apparent than real, and is due to the great number of English cases holding that after insolvency of a corporation, or after the statutory proceedings for the winding up of its affairs have been commenced, a subscriber cannot rescind his subscription or defend, in an action for the amount due, on the ground of fraud. In England, he is entirely foreclosed. It matters not that the subscriber did not discover the fraud until after the insolvency of the corporation has been declared. In this country no such absolute rule obtains. There are, however, a number of American decisions following this English doctrine. On the other hand, a majority of the best-considered, and what we think the best-reasoned, cases are committed to the doctrine that fraud may be pleaded as a defense in

an action to recover unpaid stock subscriptions, even after bankruptcy of the corporation, if no considerable debts of the corporation have been contracted after the subscription and upon the credit and faith thereon. 14 Corpus Juris, 600-601; Thompson on Corporations (3rd Ed.) vol. 5, sec. 3861; Harn v. Smith, 85 Okla. 137, 204 Pac. 642; Cook on Corporations (7th Ed.) vol 1, pp. 463-64, and cases therein cited.

The opinion in the case of Harn v. Smith, supra, contains copious citations of authorities, and extensive and lengthy quotations from the various texts supporting this rule.

A leading and reasonably recent case on this subject is People v. California Safe Deposit & Trust Co., 19 Cal. App. 414, 126 Pac. 516. In this case, after an exhaustive review of the authorities, the court, speaking through Justice Kerrigan, said:

"Some of the American text-writers have declared that corporate insolvency, as a rule, is a bar to such rescission. Cook on Corporations, sec. 164; 10 Cyc. 441. A close examination of the cases, however, upon which this statement of this principle is based, shows that the cases cited support no such proposition, and even those authors modify their declaration that subsequent insolvency is a bar to rescission, by the statement that there are strong American cases to the effect that the insolvency of a corporation and the appointment of a receiver do not always ipso facto bar the right of a subscriber to rescind his subscription on the ground of fraudulent misrepresentation. Cook on Corporation, secs. 164, 167, 170; 10 Cyc. 441, et seq.

"While it may be admitted that there is some conflict of authority on this subject, the majority and best-considered cases where the right to rescind is denied are not based upon the mere fact of the insolvency of the corporation, but for the reason that the subscriber has participated in the management of the insolvent corporation, or for some other particular cause such as would create an estoppel or some other doctrine analogous to the equitable doctrine of laches. See 2 Thompson on Corporations, secs. 1447-1456."

The Supreme Court of South Carolina recently had under consideration this particular question; and in the case of Steele v. Singletary, 120 S. C. 132, 110 S. E. 833, the court announced the rule to which we are adhering, both in the syllabus and in the body of the opinion, as follows:

"It follows from this principle that before the receiver may be allowed to destroy the defense of fraudulent misrepresentations in procuring the subscription, it must be made to appear; (1) That the receiver was appointed of an insolvent corporation; (2) that the subscriber is estopped by his conduct, laches, or otherwise from raising the question against the receiver as trustee of the creditors; (3) that a considerable amount of debts have been contracted after the subscription was made."

The court further said:

"The question of the defendant's conduct, laches or otherwise, should have been submitted to a jury. There is no showing that a considerable amount of debts have been contracted since the subscription was made."

In this particular connection, the Supreme Court of Georgia in the case of Turner v. Grangers Insurance Co., 65 Ga. 649, 38 Am. Rep. 801, held that the subscriber of stock in a corporation is not prevented from setting up the defense of fraud in procuring the purchase of the stock, unless there are creditors to an equal or larger amount on debts contracted after the subscription.

In discussing this rule, the author of Thompson on Corporations (3d Ed.) vol. 5, sec. 3864, says:

"It has been several times laid down that the defense of fraud in obtaining a subscription cannot be interposed after insolvency. But this is placed on the ground usually that the subscriber has not been prompt and diligent in discovering the fraud. Thus, where stockholders were induced to subscribe by fraudulent representations, it was held that they could not after insolvency defend as against creditors after a delay of more than two years, and during which time the means of discovering the fraud were open to them."

Having decided that the defendant could interpose this defense to the action after the corporation had been declared insolvent, the next question is upon whom rested the burden of pleading and proving supervening equities, if any? We think that this burden was clearly upon the plaintiff. The reason and foundation for such was stated by that eminent author, Pomeroy, in his Equity Jurisprudence, vol. 2, sec. 899, as follows:

"The destructive effect of fraud on any contract, covenant, or other transaction, is so essential and far-reaching that no person, however free from a participation in the fraud, can avail himself of what has been obtained by the fraud of another, unless he is not only innocent, but has given some valuable consideration." (Emphasis ours.)

A recent case supporting this principle is Martin v. Steinke, 22 Ohio App. 146, 154 N. E. 47, in which it was held that:

"One who signs a written subscription to

the capital stock of a corporation and delivers the same to an authorized agent of said company upon an oral agreement that the same shall not become binding upon said subscriber until the happening of a future event, which never occurs, is not liable to a trustee in bankruptcy representing the creditors of said company, **unless it be shown that the creditors extended credit to said company in reliance upon said subscription and without notice of said oral condition."** (Emphasis ours.)

An earlier case, by the Court of Appeals of the State of Kansas, is Beall v Dillon, 5 Kan. App. 27, 47 Pac. 317, which announced the same rule or adhered to the same doctrine. In that case the court in the opinion said:

"There is nothing in the record to indicate that any of the indebtedness which was created by the corporation after Dillon became a stockholder remained unpaid at the date of the assignment, nor that the rights of any one, either as a creditor or stockholder, was in any manner prejudiced by the alleged agreement that Dillon should be required to pay but 50 per cent. of the par value of the stock which was issued to him. For aught that appears in the record, a similar agreement may have been entered into between all of the stockholders. If such were the case, the transaction with Dillon was not a fraud sought to be perpetrated upon the stockholders. If the indebtedness was all created prior to the date that Dillion became a stockholder, no creditor has any cause for complaint concerning this agreement. Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530."

There is no allegation in the petition or the reply that the rights of any creditor of the corporation accrued after the subscription of the stock by the defendant, or that any debts were contracted by the corporation upon the faith or credit of his subscription to this stock. Much that is apposite to this point is stated by the Ohio Circuit Court in Yoder v. Hoyt, 18 Ohio Ct. Rep. (N. S.) 433 as follows:

"The rule that fraud cannot be pleaded as a defense in an action to recover unpaid stock subscriptions, after bankruptcy and after the rights of creditors have intervened is based upon the doctrine of estoppel. Likewise, a stockholder is estopped from setting up a defense that the stock is invalid, if the company is in bankruptcy and valid debts were contracted **after his subscription.** The pleadings in this case do not show that any debts were contracted by the corporation after defendant's subscription. The estoppel, therefore, does not arise and the answer is good. There are some cases which seem to hold that the **defendant** must plead and prove that the estoppel does not apply because no debts were contracted after he subscribed, but it is thought that the better practice is for the plaintiff to make out a complete case, including the estoppel, before the defendant is required to answer, for the answer is good in the absence of the estoppel. This case illustrates the thought."

The plaintiff in error contends that, because the corporation is insolvent, we should presume rights of creditors intervened after the subscription of the stock by defendant. As clearly stated by the Ohio court, just above quoted, the principle which prevents a subscriber of stock in a corporation from pleading failure of consideration and fraud on the part of the corporation in procuring its purchase, is based upon the principle of estoppel; and the burden is upon the party who relies upon estoppel to prove clearly and unequivocally every fact essential to the estoppel.

We cannot indulge in the presumption that because there were enormous liabilities at the time the corporation was declared insolvent, any considerable portion of said liabilities, or any part of said indebtedness, was created after the date of defendant's subscription, and that there was a reliance thereon as a means of extending credit. We could just as well indulge in the presumption that all of said liabilities were created before instead of after the date of said subscription.

We are therefore of the opinion that in cases involving the sale of stock of a corporation induced by fraudulent representations of the corporation and its officers, and the avoidance of liability thereon, the subscriber is entitled to be relieved from the obligations of said subscription unless creditors or others dealing with the corporation knew of and relied upon said stock subscription, and were induced to extend credit to said corporation or change their position in relation to said corporation to their injury upon the strength of said subscription; and in this case there is no pleading nor evidence tending to show that any creditors extended credit to said corporation after the subscription to the stock in question by defendant, or with knowledge of said subscription and reliance thereon.

Counsel for plaintiff in error very insistently contend that the proof in this case failed to show that Marshall, who was the president and managing officer of the bank, was the authorized agent of the bank to negotiate a sale of any shares of its capital stock. This contention is destitute of merit.

The plaintiff does not deny that Marshall was agent 'enough to get defendant's $7,000 in cash and a note for $2,500, in consideration of that amount of stock in the corporation. In other words, their contention is that he was agent enough to obtain valuable benefits to the corporation through the sale of its stock for cash and for promissory notes, but not agent 'enough to incur upon the corporation any reciprocating burdens.

The proof conclusively shows that he was the agent of the bank, and in point of fact the bank itself, and authorized and empowered to do the things which he did. In this connection, while not necessary to this case, a statement in Thompson on Corporations, vol. 5, p. 719, is appropriate:

"Fraud in inducing a subscription is a defense, although the person practicing the fraud was not authorized to do so, **but the action to recover the subscription was said to be a ratification of such fraud.**" (Emphasis ours.)

The next contention is that the eviden e was insufficient to establish the fact of fraud, and insufficient to show that defendant was sufficiently diligent in repudiating his contract of subscription, when the alleged fraud was discovered. Those questions were properly submitted to the jury, and there was ample evidence to support their findings, and the verdict and judgment on these grounds will not be disturbed.

Pertaining to the quantum of evidence necessary to establish the defense of fraud in actions of this nature, Thompson, in his work on Corporations, vol. 5, p. 718, following the case of Byars Bros. v. Maxwell (Tex. Civ. App.) 73 S. W. 437, says:

"Thus. a subscriber may defend in an action on his subscription on the ground that it was procured by false representations of the manager of the corporation, and it is not necessary to show that he relied absolutely upon such representations, but it was sufficient if he believed them to such an extent that he was influenced thereby to subscribe for the stock."

It is true that the evidence of repudiation of the subscription is largely negative, but this evidence conforms to the nature of the case, as the defendant was not seeking a rescission, but defending against an unpaid balance due on the stock. In cases of this nature, slight evidence or circumstances of repudiation is all that is required. Some of the cases and text-writers even extend the rule further. In this connection, in

Thompson on Corporations (3rd Ed.) vol. 2, sec. 844, it is said:

"The rule recently established in England is that, where the subscriber sets up fraud, as a defense to an action on the subscription, he is not required to plead repudiation since the discovery of the fraud, but the corporation must show acquiescence after knowledge of such fraud."

There are other errors advanced, but it is enough to say that we have examined the arguments of counsel for the banking commissioner with care, and find nothing that in our judgment would warrant a reversal of the judgment of the trial court.

The judgment is therefore affirmed.

BENNETT, JEFFREY, HERR, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.